THOMAS M. CRISPI (*admitted pro hac vice*)
thomas.crispi@afslaw.com
**ARENTFOX SCHIFF LLP**
1301 Avenue of the Americas, 42nd Floor
New York, NY  10019
Telephone:     212.484.3900
Facsimile:     212.484.3990

SARA T. SCHNEIDER (Bar No. 298103)
sara.schneider@afslaw.com
**ARENTFOX SCHIFF LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013
Telephone:     213.629.7400
Facsimile:     213.629.7401

STEPHEN COPENHAVER (*admitted pro hac vice*)
Steve.Copenhaver@afslaw.com
**ARENTFOX SCHIFF LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone:     312.258.5500
Facsimile:     312.258.5600

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS GORDOA, an individual; ARIANI REYES, an individual; and B.G., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE, INC., a California corporation; LUXSHARE-ICT, INC., a California corporation; and LUXSHARE PRECISION INDUSTRY CO., LTD., a Chinese Corporation, <br><br> Defendants. | Case No. 3:22-CV-02900-JSC <br><br> **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> [Filed Concurrently with Declaration of Sara T. Schneider and Exhibits Thereto and [Proposed] Order; Administrative Motion to Seal] <br><br> Judge:      Honorable Jacqueline Scott Corley <br><br> Date:       April 10, 2025 <br> Time:       10:00 a.m. <br> Location:   Courtroom 8 <br><br> Action Filed:      May 16, 2022 |

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-JSC

AFSDOCS:301303302

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................. 3

    A.    APPLE AIRPODS PRO (1ST GENERATION) COMPLY WITH ALL APPLICABLE SAFETY STANDARDS. ................................................................ 3

    B.    THE AMBER ALERT. .............................................................................. 5

    C.    THE MEASUREMENT OF SOUND ................................................................ 6

    D.    VIRAL INFECTION IS THE MOST COMMON CAUSE OF SUDDEN, SENSORY HEARING LOSS ......................................................................... 7

    E.    NOISE-INDUCED HEARING LOSS ............................................................ 8

    F.    PLAINTIFF'S TREATING PHYSICIAN ....................................................... 9

    G.    PLAINTIFF'S EXPERTS ........................................................................ 10

        1.    DR. HAHN. .............................................................................. 10

        2.    DR. CASALI. ............................................................................ 12

    H.    APPLE'S EXPERTS .............................................................................. 13

        1.    DR. ROBERT JACKLER. ........................................................... 13

        2.    DR. BRIAN FLIGOR. ................................................................ 14

III.  LEGAL STANDARD ......................................................................................... 14

IV.   ARGUMENT ..................................................................................................... 15

        1.    AIRPODS PRO ARE NOT CAPABLE OF CAUSING THE TYPE OF INJURY PLAINTIFF CLAIMS. ......................................................... 16

        2.    PLAINTIFF CANNOT PROVE THAT B.G.'S BRIEF EXPOSURE TO THE AMBER ALERT ACTUALLY CAUSED HIS INJURIES. ................................................................................ 18

    B.    PLAINTIFF'S CLAIMS SUFFER FROM OTHER FAILURES OF PROOF. ................................................................................................ 20

        1.    PLAINTIFF'S NEGLIGENT AND STRICT LIABILITY DEFECT CLAIMS FAIL BECAUSE THERE IS NO EVIDENCE OF ANY RELEVANT RISK. ...................................................................... 20

        2.    PLAINTIFF'S INABILITY TO ESTABLISH ANY RELEVANT RISK ALSO FORECLOSES HER NEGLIGENCE-BASED CLAIMS. ................................................................................... 23

        3.    THERE IS NO EVIDENCE THE SUBJECT AIRPODS PRO DIFFERED FROM THEIR INTENDED DESIGN, SO PLAINTIFF CANNOT PURSUE HER MANUFACTURING DEFECT CLAIM. ..................................................................... 23

        4.    PLAINTIFF'S FAILURE TO WARN CLAIMS FAIL ABSENT A PARTICULAR RISK ABOUT WHICH APPLE HAD A DUTY TO WARN AND BECAUSE PLAINTIFF CANNOT PROVE CAUSATION. ......................................................................... 24

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

– i –

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-JSC

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

5.    PLAINTIFF'S FAILURE OF PROOF ON DEFECT ALSO
DOOMS HER WARRANTY CLAIMS. ..................................................... 24

V.    CONCLUSION ............................................................................................. 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-JSC

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Owens-Corning Fiberglas Corp.*,
  53 Cal. 3d 987 (1991) ................................................................................ 24

*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...................................................... 16

*Birdsong v. Apple Inc.*,
  590 F. 3d 955 (9th Cir. 2009) ...................................................................... 21

*Brown v. Superior Court*,
  44 Cal. 3d 1049 (1988) ............................................................................... 25

*Carlin v. Superior Court*,
  13 Cal. 4th 1104 (1996) .............................................................................. 23

*Casey v. Ohio Medical Prods.*,
  877 F. Supp. 1380 (N.D. Cal. 1995) ...................................................... 15, 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................... 15

*Chavez v. Glock, Inc.*,
  207 Cal. App. 4th 1283 (2012) ............................................................... 20, 23

*Clausen v. M/V New Carrisa*,
  339 F. 3d 1049 (9th Cir. 2003) .................................................................... 18

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
  503 U.S. 579 (1993) .................................................................................... 15

*Grinnell v. Charles Pfizer & Co.*,
  274 Cal. App. 2d 424 (1969) ....................................................................... 24

*Hall v. Baxter Healthcare Corp.*,
  947 F. Supp. 1397 (D. Or. 1996) ................................................................. 18

*In re Hanford Nuclear Reservation Litig.*,
  292 F. 3d 1124 (9th Cir. 2002) .................................................................... 16

*Howard v. Omni Hotels Mgmt. Corp.*,
  203 Cal. App. 4th 403 (2012) ...................................................................... 21

*In re Incretin-Based Therapies Prod. Liab. Litig.*,
  524 F. Supp. 3d 1007 (S.D. Cal. 2021) ................................................... 17, 18

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-JSC

*Jones v. Ortho Pharmaceutical Corp.*,
    163 Cal. App. 3d 396 (Cal. App. 2d 1985) ...................................................................... 15, 19

*Lust v. Merrell Dow Pharmaceuticals, Inc.*,
    89 F. 3d 594 (9th Cir. 1996) ............................................................................................ 16

*Maneely v. General Motors Corp.*,
    108 F.3d 1176,1181 (9th Cir. 1997) ................................................................................ 22

*Mariscal v. Graco, Inc.*,
    52 F. Supp. 3d 973 (N.D. Cal. 2014) ............................................................................... 24

*Merrill v. Navegar, Inc.*,
    26 Cal. 4th 465 (2001) ............................................................................................... 15, 23

*Monroe v. Zimmer U.S. Inc.*,
    766 F. Supp. 2d 1012 (E.D. Ca. 2011) ........................................................................ 15, 24

*Morin v. U.S.*,
    244 Fed. App'x. 142 (9th Cir. 2007) ................................................................................ 17

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996) ........................................................................................... 19

*Newkirk v. ConAgra Foods, Inc.*,
    727 F. Supp. 2d 1006 (E.D. Wash. 2010), aff'd, 438 F. App'x 607 (9th Cir.
    2011) ........................................................................................................................... 18, 20

*In re Nexium Esomeprazole*,
    662 Fed App'x 528 (9th Cir. 2016) .................................................................................. 16

*Pannu v. Land Rover N. Am., Inc.*,
    191 Cal. App. 4th 1298 (Cal. App. 2011) ........................................................................ 24

*Redfoot v. B.F. Ascher & Co.*,
    No. 05-2045-PJH, 2007 WL 1593239 (N.D. Cal. June 1, 2007) ...................................... 16

*Rodman v. Otsuka Am. Pharm., Inc.*,
    564 F. Supp. 3d 879 (N.D. Cal. 2020), *aff'd*, No. 20-16646, 2021 WL 5850914
    (9th Cir. Dec. 9, 2021) ................................................................................................ 14, 15

*Rosa v. City of Seaside*,
    675 F. Supp. 2d 1006 (N.D. Cal.2009) ............................................................................. 24

*Rosa v. Taser Int'l, Inc.*,
    684 F. 3d 941 (9th Cir. 2012) .......................................................................................... 24

*In re Roundup Prods. Liab. Litig.*,
    734 F. Supp. 3d 930 (N.D. Cal. 2024) ......................................................................... 19, 20

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

*In re Roundup Prods. Liab. Litig.*,
   737 F. Supp. 3d 893 (N.D. Cal. 2024) .................................................................. 17

*Shepard v. Alexian Brothers Hosp.*,
   33 Cal. App. 3d 606 (1973) ................................................................................. 24

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) .................................................................. 19

*Soule v. Gen. Motors Corp.*,
   8 Cal. 4th 548 (1994) .......................................................................................... 21

*Stephens v. Union Pacific Railroad Co.*,
   935 F.3d 852 (9th Cir. 2019) ............................................................................... 19

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices &*
   *Prods. Liab. Litig.*,
   754 F. Supp. 2d 1208 (C.D. Cal. 2010) ................................................................ 23

*Trejo v. Johnson & Johnson*,
   13 Cal. App. 5th 110 (Cal. App. 2017) ................................................................. 21

*Tucker v. Wright Med. Tech., Inc.*,
   No. 11-CV-03086-YGR, 2013 WL 1149717 (N.D. Cal. Mar. 19, 2013) .............................. 14

*In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*,
   424 F. Supp. 3d 7981 (N.D. Cal. 2020) ................................................................ 17

**Court Rules**

Federal Rules of Evidence Rule 702 ....................................................................... 15

**Other Authorities**

29 CFR 1910.95 ........................................................................................................ 7

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- v -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2          **PLEASE TAKE NOTICE** that on April 10, 2025, at 10:00 a.m., in Courtroom 8 of the

3    San Francisco Courthouse of the Northern District of California, located at 450 Golden Gate

4    Ave., San Francisco, CA 94102, Defendant Apple Inc. will and hereby does move for summary

5    judgment on all of Plaintiff's causes of action.

6          This motion is brought pursuant to Federal Rule of Civil Procedure 56, and seeks

7    dismissal of all of Plaintiff's claims in their entirety.  The motion is based on this Notice of

8    Motion and Motion, the following Memorandum of Points and Authorities, and the Declaration of

9    Stephen M. Copenhaver, the pleadings and papers on file in this action, any evidence or argument

10   presented at the hearing on this motion, and any other matters this Court deems proper.

11                **MEMORANDUM OF POINTS AND AUTHORITES**

12   **I.      INTRODUCTION**

13         This case presents the straightforward legal question of whether a plaintiff can create a

14   triable product liability claim based on a novel causation theory that has never been reported

15   anywhere in the medical and scientific literature, and that is directly contradicted by decades of

16   well-established and undisputed scientific research.  Because controlling caselaw conclusively says

17   that Plaintiff cannot, Apple is entitled to summary judgment on each of Plaintiff's claims.

18         Plaintiff alleges that, while wearing his Apple AirPods Pro (1st generation) ("AirPods Pro"),

19   her minor child B.G. experienced a transient, seconds-long exposure to an Amber Alert that

20   Plaintiff claims caused profound and permanent hearing loss in his right ear.  Plaintiff's own experts

21   have measured the sound B.G. experienced between 106 and 113.5 decibels (dB)—a volume below

22   sound levels commonly experienced in everyday life, and indeed well below sounds heard at, for

23   example, an indoor sporting event or concert.  Nonetheless, Plaintiff alleged that the Amber Alert

24   "tore apart B.G.'s ear drum [and] damaged his cochlea"—which the medical examination of B.G.

25   has established is untrue—and claimed that this exposure resulted in "sudden and permanent

26   hearing loss" with accompanying tinnitus and vertigo—which is medically impossible from the

27   sound pressure B.G. experienced.  *See* Pl.'s 2nd Am. Compl., Dkt. 136-2 ¶ 17.

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-JSC

Contrary to Plaintiff's headline-grabbing allegations, medical examinations have confirmed that B.G. did not, in fact, sustain *any* acoustic trauma as a result of the Amber Alert.  That is unsurprising, as the undisputed scientific evidence establishes that exposures to sound levels greater than 180 dB—more than 1,000 times the intensity of the Amber Alert—are necessary to cause the type of injuries Plaintiff claims.  There is not a single case that has ever been reported in the medical or scientific literature that concludes, or even suggests, that any degree of hearing loss is possible at the volumes B.G. experienced.  And B.G.'s own treating physician agrees: when informed that the sound to which B.G. was exposed did not exceed even 120 dB, B.G.'s otologist acknowledged that B.G.'s injury could not have been caused by the Amber Alert.

In Plaintiff's effort to meet her burden to show that the product is even capable of causing the claimed injuries, she relies solely on the opinion of her retained causation expert, Dr. Yoav Hahn, an ear surgeon from Dallas, Texas.  Dr. Hahn has never conducted or published any research on hearing loss and does not even attempt to conduct the analysis required under the law to establish general causation.  Instead, he offers an opinion only as to specific causation, which is based on a woefully incomplete differential diagnosis that was predicated on a baseless assumption, unsupported anywhere in the medical literature, that a transient exposure to sounds less than 120 dB can cause profound hearing loss.  Apple has therefore moved to exclude Dr. Hahn's unsupported causation opinion, the granting of which would render Plaintiff unable as a matter of law to meet her burden on causation applicable to each of her claims.

Because B.G.'s AirPods Pro could not produce sound levels sufficient to cause acute noise-induced hearing loss, Plaintiff also lacks admissible evidence on which a jury could conclude that B.G.'s AirPods Pro were defective.  Specifically, because AirPods Pro cannot produce sound levels anywhere close to those capable of presenting any risk of acute hearing loss, Plaintiff cannot create a fact issue as to whether AirPods Pro present an "excessive preventable danger."

/ /

/ /

/ /

/ /

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

## II.    FACTUAL BACKGROUND

### A.    Apple AirPods Pro (1st generation) Comply with All Applicable Safety Standards.

AirPods Pro are wireless Bluetooth headphones first sold by Apple in October 2019.  Ted Cohn 5.20.2024 Dep. Tr. ("Cohn Dep."), attached as Ex. A,[1] at 50:6-10, 50:25-51:3.  AirPods Pro are designed to, and certified to be in compliance with, all applicable safety standards, including those that set acoustic output limitations.  *Id.* at 67:18-68:17, 157:22-158:20; Apple's Safety Certification Testing ("Safety Certification Testing"), APL-GORDOA_00001288–1454, attached as Ex. B; *see also* Apple's Second Suppl. Resp. to Pl.'s Rogs, Set One, attached as Ex. C, at p. 4. Among the international safety standards to which AirPods Pro have been tested and independently certified are IEC 60950 and IEC 62368, including all applicable versions thereof.  Ex. A, Cohn Dep. at 158:10-20; Ex. B, Safety Certification Testing.  Even Plaintiff's expert agrees that such standards are consensus safety standards that are "heavily relied on in the industry."  *See, e.g.,* John Casali Dep. Tr., Vol. 1 ("Casali Dep. Vol. 1"), attached as Ex. D, at 56:11-17, 57:2-17, 138:21-139:21, 140:2-20, 142:8-18.  Plaintiff's expert also agrees that it was reasonable and appropriate for Apple to have relied upon such standards in the development of AirPods Pro.  *Id.* at 59:1-11, 100:19-102:13, 105:18-106:7, 125:2-10.

The safety standards to which AirPods Pro were designed and certified required Apple to, among other things, rigorously test the volume output of AirPods Pro prior to releasing them for sale in accordance with the specific test protocols mandated by applicable safety standards.  *See, e.g.,* Ex. A, Cohn Dep. at 157:22-158:20; Ex. D, Casali Dep. Vol. 1 at 92:20-94:10, 104:2-6, 104:14-18, 105:10-22.  The standards require the acoustic output capabilities of AirPods Pro to be measured while playing an audio file at maximum volume.  Ex. A, Cohn Dep. at 158:10-20, 160:1-10, 162:16-22, 213:18-24, 238:15-239:7; Ex. D, Casali Dep. Vol. 1 at 129:6-19, 130:14-131:1. Significantly, however, Apple is not entitled to choose whatever audio file it wants to use when demonstrating compliance with the specified acoustic safety requirements.  Ex. A, Cohn Dep. at 161:17-162:6; Ex. D, Casali Dep. Vol. 1 at 112:24-113:3, 115:6-116:10, 118:7-14, 120:7-9. Instead, the standards require Apple to measure the acoustic output capabilities of AirPods Pro

---

[1] All exhibits referenced herein are to the concurrently filed declaration of Sara T. Schneider.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

while playing a specific noise file—known as the Program Simulation Noise—which was developed specifically to "resemble[] the average . . . of a wide range of program[] material, including both speech and music of several kinds." *See* EN 50332-1, attached as Ex. E, at 6; *see also* Casali Dep. Vol. 1 at 112:24-113:3, 115:6-116:10, 118:7-14, 120:7-9.

The standards then require the measured acoustic output from AirPods Pro to be converted downward into what are known as A-weighted decibels (reflected in dBA), so as to better "approximate human hearing," and then averaged, resulting in a mean acoustic output value for each test. Ex. D, Casali Dep. Vol. 1 at 109:25-111:21, 120:13-16, 137:7-11; *see also* Ex. A, Cohn Dep. at 162:7-15. To demonstrate compliance with the safety standards, each test must be performed five times. Ex. A, Cohn Dep. at 206:9-15; Ex. D, Casali Dep. Vol. 1 at 119:3-20.

When tested pursuant to the foregoing requirements, a listening device like AirPods Pro complies with the applicable safety requirements so long as its final average acoustic output is below 100 dBA, even though the peak acoustic output is allowed to exceed 100 dB during each test. Ex. D, Casali Dep. Vol. 1 at 127:11-18, 129:24-130:7, 130:21-132:1, 132:18-133:4, 135:18-136:2, 137:18-138:3; Ex. A, Cohn Dep. at 176:12-14. AirPods Pro did not exceed 100 dBA when tested pursuant to the specified protocol during any of the five tests. Ex. B, Safety Certification Testing at APL-GORDOA_00001300; *see also* Ex. A, Cohn Dep. at 158:10-20; 162:7-12.

According to the standards themselves, a product's compliance with the acoustic output requirements is designed to ensure that the product is "designed and constructed as to present no danger when used for its intended purpose…particularly providing protection against exposure to excessive sound pressures from headphones and earphones[,]" and therefore protects users against any risk of acute noise injury. EN 60950, attached as Ex. F, at 3; Brian Fligor Dep. Tr. ("Fligor Dep."), attached as Ex. G, at 220:3-18 ("[I]f you adhere anywhere close to those maximum output levels noted in the standard…you are going to fall outrageously short of those levels necessary to cause any damage from an instantaneous sound exposure."). It is undisputed that the subject AirPods Pro were certified to comply with applicable safety standards, including those related to acoustic output. Ex. B, Safety Certification Testing; Ex. A, Cohn Dep. at 157:22-158:20.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

### B.    The Amber Alert.

In May 2020, when Plaintiff's son B.G. was 12 years old, B.G. suffered acute, severe, permanent unilateral hearing loss in his right ear, accompanied by fatigue, tinnitus, and a short period of vertigo. *See* Dr. Robert Jackler Declaration ("Jackler Decl."), attached as Ex. H, at ¶ 25. B.G. first became aware of his hearing loss when an Amber Alert played through the right earbud of his AirPods Pro. *Id.*[2]

As part of their analyses in this case, Plaintiff's experts tested the noise level produced by the Amber Alert signal that played through B.G.'s AirPods Pro. According to Plaintiff's experts, the sound pressure level to which B.G. was exposed was between 106.1 dBA and 113.5 dB. *See* Ex. D, Casali Dep. Vol. 1 at 204:20-205:12, 208:22-209:9 (identifying 106.1 dBA as the highest value when asked to opine on the acoustic output of the Amber Alert playing through AirPods Pro); *see also* Yoav Hahn Dep. Tr. ("Hahn Dep."), attached as Ex. I, at 17:23-18:3 (identifying 113.5 dB as the sound level for the Amber Alert B.G. heard through his AirPods Pro). Regardless of the method of measurement, all parties' experts agree that the Amber Alert to which B.G. was exposed was less than 120 dB at all times.[3] Ex. G, Fligor Dep. at 114:24-115:14, 115:23-116:2; Robert Jackler Dep. Tr. ("Jackler Dep."), attached as Ex. K, at 109:20-110:1.

There is not a single case report or other suggestion in the medical literature that any degree of hearing loss is possible from a transient exposure to sound pressure levels even in the 120 dB range. Despite the millions of instances in which individuals have been exposed to an Amber Alert, including through AirPods Pro and other Bluetooth headphones with similar acoustic output capabilities, there is not a single case reported in the medical literature of hearing loss deemed to

---

[2] The Amber Alert system is one of many alert systems within the Wireless Emergency Alert program operated by the Federal Emergency Management Agency. It began in 1996 with the intent of operating as an early warning system to help find abducted children. Since that time, it has contributed to the recovery of at least 1,221 children. *See* *https://amberalert.ojp.gov/about* (last accessed January 22, 2025).

[3] Acoustic outputs for wireless Bluetooth headphones are often reported in mean values, in accordance with the testing requirements of applicable safety standards. Nonetheless, various experts in this case also measured instantaneous peak values for the Amber Alert playing through AirPods Pro. The highest peak value recorded at any point during any of the testing performed in this case was 117.3 by Dr. Casali and 117.8 by Dr. Fligor. John Casali Dep. Tr., Vol. 2 ("Casali Dep. Vol. 2"), attached as Ex. J, at 422:14-423:12; 425:10-16.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1    have been caused by an Amber Alert.  Ex. H, Jackler Decl. at ¶¶ 29-30, 38; *see also* Ex. I, Hahn

2    Dep. at 49:25-50:4; Ex. G, Fligor Dep. at 217:11-218:15.

3    **C.    The Measurement of Sound.**

4        Sound intensity is measured in decibels (dB), which reflects the sound pressure created by

5    a stimulus.  Jackler Decl. at ¶21.  Decibels are measured on a logarithmic scale with exponential

6    growth at the relevant sound levels, such that a 20 dB increase represents a ten-fold of the sound

7    pressure, a 40 dB increase represents a *100-fold* increase of the sound pressure, a 60 dB increase

8    represents a *1,000-fold* increase of sound pressure.  *See id. at* ¶¶33-34, 68.

9        Exposure to sounds in the range of 120 dB—higher than the highest sounds produced by

10   AirPods Pro playing an Amber Alert—are common in everyday life.  Ex. K, Jackler Dep. at 152:1-

11   20; *see also* Ex. I, Hahn Dep. at 44:11-18; Lance Jackson Dep. Tr., Vol. 2 ("Jackson Dep. Vol. 2"),

12   attached as Ex. L, at 22:6-11.  Sirens of a passing emergency vehicles (e.g., ambulances, fire

13   engines, or police cars), church bells, gas-powered leaf blowers, chainsaws, jackhammers, fire

14   alarms, thunder, rock concerts, and sports events are just a few examples of common sounds that

15   equal or exceed the sound pressure produced by the Amber Alert B.G. experienced.  Jackler Decl.

16   at ¶ 71; se*e also* Lance Jackson Dep. Tr., Vol. 1 ("Jackson Dep. Vol. 1"), attached as Ex. M, at

17   26:2-16 (identifying police car and ambulance sirens as around 120 dB; jackhammers as around

18   130 dB; and airplanes taking of as around 140 dB).

19       Both Plaintiff's expert Dr. Hahn and B.G.'s own treating otologist Dr. Jackson agree that

20   exposures to sound levels between 110 and 120 dB are common occurrences amongst the general

21   population.  *See* Ex. I, Hahn Dep. at 44:11-18 (acknowledging that people in everyday life are

22   routinely exposed to ranges of noise that encompass sounds higher than the subject Amber Alert);

23   *see also* Ex. L, Jackson Dep. Vol. 2 at 22:6-11 (agreeing it is common for people to be exposed to

24   sounds between 100 and 120 decibels during ordinary life).  Prior to being exposed to the Amber

25   Alert, B.G. himself would certainly have been exposed many times to noise levels at or above that

26   produced by the Amber Alert.  *See* Ex. L, Jackson Dep. Vol. 2 at 33:5-20.  Brief exposures to such

27   sounds simply do not create any risk of acute hearing loss.  If such transient exposures to sound

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

levels that people commonly experience in everyday life were capable of causing acute, severe hearing loss, "much of the American population would be deaf." Ex. H, Jackler Decl. at ¶ 71.

The unremarkable nature of exposures to sounds between 110 and 120 dB is exemplified by the approach to such exposures adopted by the Occupational Safety and Health Administration (OSHA) in its standards for continuous noise exposure. *See* 29 CFR 1910.95. OSHA promulgates and enforces standards for worker safety regarding occupational noise exposures. *Id.*; *see also* Ex. H, Jackler Decl. at ¶¶ 60-64. OSHA regulatory standards—containing safety mandates applicable to all U.S. workers—specify limits of permitted unprotected noise exposures. *See* 29 CFR 1910.95; *see also* Ex. H, Jackler Decl. at ¶ 61. Under applicable OSHA regulations, workers are permitted to be subjected to noise levels of 120 dB, significantly louder than the Amber Alert at issue in this case, for up to 7 minutes and 30 seconds every working day *without hearing protection* over their entire working careers. *See* 29 CFR 1910.95; *see also* Ex. H, Jackler Decl. at. ¶ 62. At 115 dB, the daily permitted exposures increase to 15 minutes. *Id; see also* Ex. H, Jackler Decl. at. ¶ 63. By contrast, B.G. was exposed to an Amber Alert for approximately 10 seconds, resulting in a cumulative sound exposure that is a "trivial fraction of the exposure duration deemed safe by OSHA." Ex. H, Jackler Decl., at ¶ 62.

**D.    Viral Infection is the Most Common Cause of Sudden, Sensory Hearing Loss**

Sudden unilateral sensory hearing loss is not a rare condition, as approximately 66,000 cases are diagnosed in the U.S. every year. Ex. H, Jackler Decl. at ¶ 72. There are numerous medical causes of the type of sudden, severe unilateral hearing loss that Plaintiff claims. *Id.* All experts in this case agree that *by far* its most common cause especially in the pediatric population, is a viral infection—e.g., mumps, rubella, herpes simplex, influenza, and, most significantly, COVID-19. *See* Ex. K, Jackler Dep. at 110:23-111:13 (a "viral inner ear infection" is "by far the most common cause of sudden unilateral hearing loss in the pediatric age group."); *see also* Ex. H, Jackler Decl. at ¶¶ 73-74; Ex. I, Hahn Dep. at 19:23-20:1; 20:10-21:5 (agreeing that the "vast majority" of cases of sudden, unilateral hearing loss are caused by viruses, including COVID-19).

While not commonly known at the time of B.G.'s alleged incident, in the years since the COVID-19 pandemic began, medical researchers have established a clear link between COVID-19

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1   infection and the type of hearing loss claimed by B.G.[4]  Ex. H, Jackler Decl. at ¶¶ 76-82.  Indeed,

2   COVID-19 has "resulted in a worldwide epidemic of sudden, unilateral sensory hearing loss." *Id.* at

3   ¶ 76.  Even Plaintiff's causation expert, Dr. Hahn, concedes that COVID-19 infection can cause

4   sudden sensory hearing loss and that a patient presenting with hearing loss caused by COVID-19

5   would present with the same symptoms as B.G.  Ex. I, Hahn Dep. at 140:24-141:6; 141:17-142:10.

6   In is undisputed that people—including adolescents—can and do develop COVID-19 related

7   severe, unilateral sudden hearing loss where their only symptom of a COVID-19 infection is the

8   hearing loss itself.  *Id.* at 142:14-18; 143:2-7; *see also* Ex. H, Jackler Decl. at ¶¶ 76-79.

9               **E.      Noise-Induced Hearing Loss**

10              Severe, permanent noise-induced hearing loss after an acute noise exposure is very rare in

11  civilian life.  Ex. H, Jackler Decl. at ¶ 56.  Because hearing loss from acute noise exposure can be

12  caused only by an exposure to an extraordinarily high intensity noise, this type of hearing loss is

13  most commonly seen in the military, among soldiers exposed to firearms and explosives; the sound

14  pressure required for such acute noise-induced hearing loss is not common for everyday civilians.

15  *Id.*  The level of sound exposure to which B.G. was exposed via the Amber Alert was multiple

16  "orders of magnitude lower than the threshold necessary in terms of sound intensity needed to cause

17  the kind of serious hearing loss he had." Ex. K, Jackler Dep. at 111:15-112:1.

18              The threshold for even mild, acute acoustic trauma induced hearing loss is approximately

19  140 dB—more than *10 times* the intensity of the Amber Alert played through B.G.'s AirPods Pro.

20  *See* Ex. H, Jackler Decl. at ¶¶33, 63; *see also* Ex. G, Fligor Dep. at 182:2-6; Ex. M, Jackson Dep.

21  Vol. 1 at 29:7-14 (sound exposures of at least 140 dB are necessary to cause sudden sensory hearing

22  loss).  The lowest level that has ever even been even *suggested* in the medical literature as

23  *potentially* sufficient to cause even mild acute noise-induced hearing loss in the most susceptible

24  of individuals is 132 dB—more than *six times* the intensity of the Amber Alert played through

25  B.G.'s AirPods Pro. Ex. G, Fligor Dep. at 182:7-17. Even then, however, that was only theoretical;

26  there has "never been a study published, a case study or anything, that indicates anyone has

27
28

---

[4] At the time B.G. sustained his hearing loss and resulting symptoms, there was not yet available any widespread testing for COVID-19 nor had the first vaccinations been released.  *See* Ex. K, Jackler Dep. Tr. at 114:5-17 and 128:8-23.  At the same time, COVID infections in Texas, where B.G. was living, had spiked.  *Id.* at 119:9-120:16, Ex. H, Jackler Del, ¶¶ 83, 84.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

developed hearing loss from levels as low as 132 [dB]." *Id.*; *see also* Ex. K, Jackler Dep. at 121:8-15 ("there's not a single reported case in the world literature of this type of hearing loss with an under 120 decibel sound incident on the ear").

Even Plaintiff's own causation expert, Dr. Hahn, agrees that "the level at which a few seconds of broadband noise can cause acoustic trauma in the most susceptible individuals probably lies between 130 and 140 dBA," as much as *10 times* (or greater) than sound pressure levels to which B.G. was exposed via the Amber Alert.  *See* Yoav Hahn Jul. 15, 2024 Report ("Hahn Rpt."), attached as Ex. N, at p. 5; *see also* Ex. I, Hahn Dep. at 17:9-15.  Accordingly, Dr. Hahn conceded that, "because the acoustic stimulus that [B.G.] sustained through the Apple AirPod [*sic*] in his right ear was approximately at a level of 113.5 dB, it is not likely that he sustained acoustic trauma." Ex. N, Hahn Rpt. at 5.

**F.    Plaintiff's Treating Physician**

Dr. Jackson, B.G.'s treating otologist confirms that B.G.'s exposure to the Amber Alert was insufficient to cause any acoustic trauma.    First, Dr. Jackson confirmed that, on physical examination, B.G. did not show any signs of physical trauma in his ear at all immediately after the alleged Amber Alert incident.  Ex. M, Jackson Dep. Vol. 1 at 45:4-14; *accord* Ex. K, Jackler Dep. at 152:8-15 ("And when [B.G.] was seen early on after the amber alert, there was no redness, swelling, bleeding, edema.  The ear looked perfectly normal, which is what you would expect in a viral inner ear infection but not in a very loud sound, which would also injure the eardrum."). Second, although Dr. Jackson has never published any research on the causes of sudden sensory hearing loss, (Ex. M, Jackson Dep. Vol. 1 at 10:22-24), he nonetheless understands that sound exposures on the order of 140 dB are necessary to cause acute noise-induced hearing loss.  *Id.* at 29:7-14.  Accordingly, when informed that the Amber Alert to which B.G. was exposed was determined to not exceed 120 dB—more than 10 times less than the level he acknowledges is necessary to cause any degree of acute noise-induced hearing loss—Dr. Jackson testified that B.G.'s AirPods Pro did not cause B.G.'s injuries.  Ex. L, Jackson Dep. Vol. 2, at 37:25-38:12.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1

2

G.    **Plaintiff's Experts**

1.    **Dr. Hahn.**

Plaintiff has disclosed Dr. Hahn as her only medical causation expert to opine as to the cause of B.G.'s hearing loss.  *See* Pl.'s Rule 26 Disclosures, attached as Ex. O.[5]  Dr. Hahn is an otolaryngologist and surgeon from Dallas, Texas, who, despite being retained to offer causation opinions in this case, has never published or taught on the topic of hearing loss.  Ex. I, Hahn Dep. at 174:7-21; 176:6-9.  For purposes of his opinion in this case, Dr. Hahn did not conduct any analysis or research on, or render any specific opinions about, general causation.  *See, e.g.*, Ex. I, Hahn Dep. at 88:17-90:1 (admitting that his only inquiry into the capability of sound exposures at these levels to cause acoustic trauma generally was to assess B.G.'s individual symptoms), 78:17-79:20; 102:12-104:10. (admitting that the only basis he has for saying that the level of sound exposure at issue would be capable of causing the types of injuries claimed by Plaintiff is the alleged temporal connection between the Amber Alert and B.G.'s reported symptoms).

Instead, Dr. Hahn offers only an opinion on specific causation, which he reached on the basis of a purported "differential diagnosis," and without first showing that B.G.'s exposure was even capable of causing the injuries Dr. Hahn attributes to it.  Based solely on his "differential diagnosis," Dr. Hahn has reached two diametrically opposite conclusions that cannot both be true.

First, in accord with B.G.'s own treating physician, the lack of any observable damage to B.G.'s inner ear, and the unanimous conclusion of all relevant medical and scientific literature, Dr. Hahn concedes that, because the Amber Alert reached only 113.5 dB, "[B.G.] *did not sustain an acoustic trauma*" as a result of the alleged incident.  Ex. I, Hahn Dep. at 17:23-18:15.

Second, in direct contrast to his own concession, and without citation to any objective source, Dr. Hahn claims that the Amber Alert somehow caused a traumatic rupture in the robust membranes of B.G.'s inner ear, a condition known as a noise-induced Perilymph Fistula ("PLF")—itself a form of acoustic trauma:

---

[5] Plaintiff's other experts have explicitly conceded that they have no opinions regarding causation in this case.  *See* Ex., D, Casali Dep. Vol. 1 at 38:25-39:11; Kichol Lee Dep. Tr. ("Lee Dep."), attached as Ex. P, at 10:19-22; Anthony Andre Dep. Tr. ("Andre Dep."), attached as Ex. Q, at 172:17-22; Eric Tarr Dep. Tr. ("Tarr Dep."), attached as Ex. R, at 17:16-21.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

Q:    You are postulating in this case that exposure to sound at a level below 120 decibels resulted in a PLF . . . inside [B.G.]'s ear, true?

A:    I am saying that, yes, the noise exposure that he sustained caused a PLF.

Q:    And have you ever seen a case reported anywhere in the medical literature where what you're claiming happened in this case has been reported involving a level of exposure below 130 decibels?

A:    I have not seen any reports of that.

Q:    When a sound is sufficient to . . . rupture the internal membranes of the ear . . . **is that considered acoustic trauma?**

A:    **Yes.** It would be – acoustic trauma is caused by a loud sound causing damage to the inner ear internal membranes.

*Id.* at 78:4-25 (emphasis added).

Dr. Hahn's opinion is therefore that a noise exposure that was not loud enough to cause, and therefore did not cause, an acoustic trauma in B.G. nonetheless caused B.G. to sustain an acoustic trauma.   The inherent contradiction of Dr. Hahn's opinion is self-evident and irreconcilable.  And its unprecedented nature is highlighted by the fact that its occurrence has never even been suggested as possible in the medical or scientific literature:

Q:    Are you aware of any – anyone even submitting a paper for peer review suggesting that a PLF can be caused by a noise exposure to a sound level below 120 decibels?

A:    I am not aware of that.

*Id.* at 104:2-6.

Although Dr. Hahn ascribes B.G.'s injuries, including his hearing loss, to the alleged PLF (*id.* at 97:12-16; 98:4-11; 101:22-102:6; 110:3-8), Dr. Hahn also believes that something called "acoustic shock," a novel and generally unrecognized condition with no generally accepted cause or diagnostic criteria, is also a "*potential* cause of his symptoms."  *Id.* at 108:21-23; *but see id.* at 97:12-98:11 (admitting that so-called acoustic shock could not have caused B.G.'s hearing loss). Additionally, although Dr. Hahn initially opined that the Amber Alert likely caused B.G. to also sustain something called post-traumatic Meniere's disease (*see* Ex. N, Hahn Rpt. at p. 7), Dr. Hahn later conceded that was not the case.  Ex. I, Hahn Dep. at 105:23-106:2 ("It does not appear to me that [B.G.] has post-traumatic Meniere's disease.")

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

Dr. Hahn made his diagnoses in this case despite: (1) admitting that B.G. was exposed to sound levels substantially below those capable of damaging the fine hair cells of the inner ear, which he admits are significantly more susceptible to noise injury than the robust membranes of the inner ear that he speculates were ruptured (*id.* at 88:6-16); (2) observing no physical injury or rupture of any kind to B.G.'s ear, including its inner membranes (*id.* at 69:17-24; 71:5-23; 88:6-10); (3) admitting that B.G.'s symptoms were neither specific to, nor diagnostic of, these conditions (*id.* at 64:12-24, 108:4-23, 110:3-8, 14-22); and (4) there being no case reported anywhere in the medical or scientific literature demonstrating that sound exposures of the severity experienced by B.G. are even remotely capable of causing the injuries he claims (*id.* at 75:24-77:10; 78:4-14; 89:13-90:1; 164:13-165:8).

### 2.    Dr. Casali.

Plaintiff also disclosed Dr. Casali as a human factors engineer with a specific focus in acoustics engineering. *See* Ex. O, Pl.'s Rule 26 Disclosures. According to Dr. Casali, his role as an expert in this case was to "take technical measurements" of the "output of the earphone" and compare those against applicable industry standards. Ex. D, Casali Dep. Vol. 1 at 40:12-21. Dr. Casali specifically disclaimed any clinical or medical opinions as to causation or diagnosis, including the levels of sound exposure necessary to cause injury. *Id.* at 10:17-21, 39:4-11. Although Dr. Casali testified that he believes AirPods Pro should have been equipped with a software-based "output limiter" that would prevent the Amber Alert from even momentarily exceeding 100 dB, Dr. Casali readily concedes that he cannot offer any opinion about whether acute exposures above that level are capable of causing hearing loss in any individual. *See id.* at 50:14-51:18. While testifying that AirPods Pro should have limited the acoustic output of the Amber Alert to 100 dB, Dr. Casali declined to opine that the failure of a listening device to do so renders the product defective or even that all headphones should be so limited. *See* Ex. J, Casali Dep. Vol. 2 at 356:6-358:18; Ex. D, Casali Dep. Vol. 1 at 215:25-216:11.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

### H.    Apple's Experts.

#### 1.    Dr. Robert Jackler.

Dr. Jackler is a leading scholar of otology and neurotology and is among the foremost experts on hearing loss and hearing-loss causation in the world.  He is a board-certified otolaryngologist and neurologist at Stanford University, where he has served as the Chair of the Department of Otolaryngology-Head & Neck Surgery and as a professor in the departments of Neurosurgery and Surgery.  Ex. H, Jackler Decl. at ¶¶ 4-5.  Dr. Jackler has published more than 220 peer-reviewed papers, more than 40 book chapters, numerous editorials, and four books in the fields of otology and neurotology.  *Id.* at ¶ 6.  Dr. Jackler founded and led the Stanford Initiative to Cure Hearing Loss and is the past president of the American Neurotology Society.  *Id.* at ¶¶ 8-9.  For 11 years, Dr. Jackler served as Editor-in-Chief of Otology and Neurotology, the world's leading journal in the fields of otology and neurotology.  *Id.* at ¶ 9.  Dr. Jackler also served as Stanford University's Chief COVID epidemiologist.  Ex. K, Jackler Dep. at 128:8-23.

As Dr. Jackler explains in his report, his deposition testimony, and the attached declaration: given the level of sound exposure necessary to cause hearing loss, as well as the absence of any indicia of such noise exposure in B.G., "[i]t is physically and medically impossible" for the Amber Alert sound played through B.G.'s AirPods Pro to have caused his injuries.  Ex. H, Jackler Decl. at ¶¶ 35, 86.  Accordingly, after determining that there was no medical or other basis to conclude that the Amber Alert was capable of causing B.G.'s injuries, and based upon his review of B.G.'s medical history and his own physical examination of B.G., Dr. Jackler determined that "nothing explains the catastrophic loss of hearing and vertigo that [B.G. developed] other than a virus, which happens to be the number one cause of sudden [hearing] loss in children."  Ex. K, Jackler Dep. at 109:10-110:20; 155:25-159:11.  Based upon the epidemiological data linking COVID-19 infections to sudden, profound unilateral hearing loss (*id.* at 110:2-16), the high incidence of COVID infections at the time of B.G.'s hearing loss (*id.* at 120:12-16; 158:20-160:11), and B.G.'s own documented symptoms of COVID-19 at the time of his hearing loss (*id.* at 119:9-23), Dr. Jackler determined that the most likely cause of B.G.'s injuries was a COVID-19 infection.  *Id.* at 110:17-20; *see also* Ex. H, Jackler Decl. at ¶¶ 72-86.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1

### 2.    Dr. Brian Fligor.

2      Dr. Fligor, ScD, PASC, is a pediatric audiologist and is on the board of the American

3   Academy of Audiology Foundation.  Ex. G, Fligor Dep., Ex. 2 at p. 3.  He was the prior director of

4   diagnostic audiology at Boston Children's Hospital and has served an assistant professor at Harvard

5   Medical School.  Ex. G, Fligor Dep. at 19:7-14.  He has extensive history in the research of acquired

6   and traumatic hearing loss and ototoxicity and has published on these topics extensively.  *See* Ex.

7   G, Fligor Dep., Ex. 2 at pp. 19-23.  As a clinical audiologist, Dr. Fligor regularly examines patients

8   and renders opinions as to the diagnosis, care and treatment of hearing loss.  Ex. G, Fligor Dep. at

9   214:22-215:3.

10     As Dr. Fligor explains, it is well-established in the medical and scientific literature that

11   acute "hearing loss or hearing damage can never be caused by sound pressure level[s] less than 120

12   decibels."  *Id.* at 181:6-24.  Accordingly, the levels produced by the Amber Alert to which B.G.

13   was exposed in this case were "not even close" to the levels necessary to have caused B.G.'s injury.

14   *Id.* at 217:11-25, 218:1-219:4.  In fact, the levels produced by the Amber Alert were not capable of

15   causing any degree of acute hearing loss *at all*.  *Id.* at 218:1-10.

16   ## III.    LEGAL STANDARD

17     A court must grant summary judgment if the moving party can "show the absence of a

18   genuine issue of material fact with respect to an essential element of the non-moving party's claim,

19   or to a defense on which the non-moving party will bear the burden of persuasion at trial."  *Rodman*

20   *v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 885 (N.D. Cal. 2020), *aff'd,* No. 20-16646, 2021

21   WL 5850914 (9th Cir. Dec. 9, 2021) (citing Fed. R. Civ. P. 56(a)).  Where the nonmovant bears

22   the burden of proof, "the moving party can prevail merely by pointing out to the district court that

23   the non-moving party lacks evidence to support its case."  *Tucker v. Wright Med. Tech., Inc.*, No.

24   11-CV-03086-YGR, 2013 WL 1149717, at *2 (N.D. Cal. Mar. 19, 2013).

25     Once the moving party has pointed to a lack of evidentiary support as to any required

26   element, "the burden then shifts to the party opposing summary judgment to identify 'specific facts

27   showing there is a genuine issue for trial.'"  *Rodman*, 564 F. Supp. 3d at 885 (citing Fed. R. Civ. P.

28   56(a)).  The party opposing summary judgment must then present affirmative evidence from which

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

a jury could properly return a verdict in that party's favor.  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.    ARGUMENT

### A.    Plaintiff's Claims Fail as a Matter of Law Because Plaintiff Cannot Prove Causation.

Each of Plaintiff's claims against Apple should be dismissed because Plaintiff cannot create a triable issue of fact on general or specific causation: she lacks any admissible evidence on which a jury could properly conclude that a brief exposure to the level of sound created by an Amber Alert through B.G.'s AirPods Pro was capable of causing or in fact caused B.G.'s injuries.

Causation is an essential element of each of Plaintiff's claims, the failure of proof on which entitles Apple to summary judgment.  *See Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 478 (2001) ("[U]nder either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury.").  As a matter of general causation, Plaintiff must be able to show "that the product is capable of causing the harm," and as a matter of specific causation, "that the product caused the harm in this specific case."  *See Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1038 (E.D. Ca. 2011) (dismissing strict liability design defect claim) (citing *Casey v. Ohio Medical Prods.*, 877 F. Supp. 1380, 1382 (N.D. Cal. 1995)).  And because determining the cause of Plaintiff's claimed injury requires a discussion of complex medical and scientific issues, Plaintiff must support her claims with admissible expert testimony. *See Jones v. Ortho Pharmaceutical Corp.,* 163 Cal. App. 3d 396, 402 (Cal. App. 2d 1985) ("The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony."); *Monroe*, 766 F. Supp. 2d at 1038.

As set forth in Apple's Motion to Exclude Dr. Hahn's causation opinions, Dr. Hahn lacks any reliable basis to offer a general causation opinion here, as he neither conducted any research to formulate such an opinion, nor is he able to cite to any medical or scientific literature that supports it.  Dr. Hahn's opinions are therefore inadmissible under the standards set for in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 503 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. Without any admissible expert opinion testimony establishing general causation—i.e., that a brief exposure to noise levels under 120 dB is capable of causing the type of sudden, profound, hearing

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1  loss and resulting injuries alleged by B.G. in this case—all of Plaintiff's claims necessarily fail and

2  the Court need not even address specific causation. *See In re Nexium Esomeprazole*, 662 Fed App'x

3  528, 530 (9th Cir. 2016) (affirming summary judgment where the district court excluded plaintiff's

4  expert testimony on general causation); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F. 3d 594,

5  598 (9th Cir. 1996) (same). And even if the Court did reach the question of specific causation,

6  Plaintiff's claims would still fail, as Dr. Hahn's specific causation opinion improperly assumes that

7  the Amber Alert was generally capable of causing B.G.'s injuries and because Dr. Hahn cannot

8  reliably rule out a viral cause of B.G.'s injury.

9     **1. AirPods Pro Are Not Capable of Causing the Type of Injury Plaintiff Claims.**

10

11     Plaintiff cannot present a triable issue as to general causation—that is, whether a seconds-

12  long exposure to a noise stimulus of less than 120 dB is capable of causing profound, permanent

13  hearing loss. *See In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 524

14  F. Supp. 2d 1166, 1171-72 (N.D. Cal. 2007) (a plaintiff must be able to prove an exposure is

15  "capable of causing a particular injury or condition in the general population"); *In re Hanford*

16  *Nuclear Reservation Litig.*, 292 F. 3d 1124, 1133 (9th Cir. 2002) (holding that "the appropriate

17  understanding of general causation" focuses on whether, "*at the level of exposure alleged by*

18  *plaintiffs*" substance is capable of causing particular injury in general population) (emphasis

19  added)); *see also Redfoot v. B.F. Ascher & Co.*, No. 05-2045-PJH, 2007 WL 1593239, *16 (N.D.

20  Cal. June 1, 2007) (excluding general causation opinion and awarding summary judgment where

21  expert "cited no reliable, peer-reviewed epidemiological studies showing a causal link" between

22  exposure at the specific dose alleged by plaintiff and plaintiff's alleged injury). The unanimous

23  conclusion of all available medical and scientific literature is that the level of sound pressure to

24  which B.G. was exposed from the Amber Alert was *many hundreds of times* less than that necessary

25  to cause acute noise-induced hearing loss. *See* Ex. H, Jackler Decl. at ¶¶ 30-35; Ex. G, Fligor

26  Dep. at 216:16-217:4; 217:11-25; 218:1-219:4. Decades of scientific and medical research have

27  established that exposures to sound pressure levels in excess of 180 dB—more than *1,000 times*

28  *greater* than AirPods Pro produced from the Amber Alert—are required to rupture the robust

  membranes of the inner ear, as Dr. Hahn speculates happened here. Ex. H, Jackler Decl. at ¶¶ 30-

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

35, 67; Ex. G, Fligor Dep. at 218:11-219:4.  And no transient exposure to sound at less than 130 dB can cause any degree of permanent hearing loss. Ex. G, Fligor Dep. at 218:11-219:10.

Although "[a]n admissible opinion on general causation is necessary for a plaintiff . . . to survive summary judgment," (*In re Roundup Prods. Liab. Litig.*, 737 F. Supp. 3d 893, 898 (N.D. Cal. 2024)), Plaintiff's only causation expert—Dr. Hahn—did not even attempt to justify his novel theory with reference to any scientific literature or even case reports; he admits there are no studies or other medical or scientific literature that show that his theory is even possible.  Ex. I, Hahn Dep. at 57:5-12.  Because Dr. Hahn "did not conduct any independent research to support his conclusion that [the alleged exposure was] generally capable of causing [the alleged injury], nor did the studies he cited provide sufficient support for that principle," Plaintiff should not be permitted to present this unreliable causation opinion to a jury.  *See Morin v. U.S.*, 244 Fed. App'x. 142, 143 (9th Cir. 2007) (affirming summary judgment based on exclusion of causation expert); *see also In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1044-45 (S.D. Cal. 2021) (excluding causation opinion as unreliable and awarding summary judgment where proffered causation opinion was inconsistent with available published literature) (citing *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 7981, 798–89 (N.D. Cal. 2020) (finding that experts' "opinions must be excluded" because "despite substantial research on the issue over many years, plaintiffs' experts apparently stand alone" and "there simply is no interpretation by anyone other than plaintiffs' experts that supports general causation")).

Rather than "cite to any … epidemiological or etiological study linking [the allegedly defective exposure] to [the injury alleged by Plaintiff]," *Casey*, 877 F. Supp. at 1385-86, as he would have been required to do to opine on general causation, Dr. Hahn merely performed what he dubs a "differential diagnosis" of B.G.  "Yet Plaintiff may not rely upon a differential diagnosis to prove general causation" in this case because the "causal relationship between [noise exposure] and [hearing loss] has for several years been the topic of various scientific, medical, and regulatory examination, resulting in numerous animal and clinical studies and peer-reviewed literature."[6] *See*

---

[6] Although a differential diagnosis may be used as evidence of general causation in the limited (and inapplicable) circumstance where there is a dearth of published literature investigating the injurious

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

*In re Incretin Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1051 (S.D. Cal. 2021) (granting summary judgment where plaintiff's expert failed to offer reliable evidence establishing general causation).

### 2.    Plaintiff Cannot Prove that B.G.'s Brief Exposure to the Amber Alert Actually Caused his Injuries.

Although the Court need not address specific causation in light of Plaintiff's inability to prove general causation, *see Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006, 1030 (E.D. Wash. 2010), aff'd, 438 F. App'x 607 (9th Cir. 2011), Plaintiff's claims would still fail, as she cannot establish *specific* causation—i.e., that B.G.'s exposure to the Amber Alert was the actual cause-in-fact of his injury.

To establish specific causation in this case, Plaintiff relies upon Dr. Hahn and his supposed "differential diagnosis." But, as set forth in Apple's Motion to Exclude Causation Opinions, Dr. Hahn's differential diagnosis is unreliable and inadmissible because it: (1) relies on an unsupported assumption that the Amber Alert was generally capable of causing B.G.'s injury; and (2) does not and cannot reliably rule out a viral cause of B.G.'s injury.

### a.    Dr. Hahn's Differential Diagnosis Improperly Assumes that B.G.'s Noise Exposure was Capable of Causing his Injury.

Any reliable differential diagnosis necessarily requires the consideration of only potential causes that are actually capable of causing the specific injury at issue. *See Clausen v. M/V New Carrisa*, 339 F. 3d 1049, 1058–59 (9th Cir. 2003) (finding that differential diagnosis must necessarily consider only those causes "capable of causing the patient's symptoms.") (citing *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1397, 1413 (D. Or. 1996) ("[I]t is … important to recognize that a fundamental assumption underlying [differential diagnosis] is that the final, suspected 'cause' … must actually be capable of causing the injury.")). In performing a differential diagnosis, "[e]xpert testimony that rules in a potential cause that is *not* so capable is unreliable." *Id.* at 1058 (emphasis in original); *see also Henricksen*, 605 F. Supp. 2d at 1176 ("Without reliable

---

effect of the exposure at issue (*see Clausen v. M/V New Carrisa*, 339 F. 3d at 1060), it cannot be used where, as here, there is substantial academic and medical literature on the issue of causation. *In re Incretin*, 524 F. Supp. 3d at 1051 (excluding causation expert and holding that expert may not utilize "differential diagnosis to prove general causation").

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

evidence of general causation, [an expert] cannot analyze specific causation while comporting with the scientific method.").

Here, Dr. Hahn cannot establish, and does not attempt to establish, that a brief exposure to sound levels below 120 dB is capable of causing the types of injury sustained by B.G.  Instead, Dr. Hahn simply *assumes* that to be true, despite acknowledging that no such case has ever been reported, or suggested, in the medical or scientific literature.  As a matter of law, that is insufficient to create a fact issue as to specific causation.  *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 922 (C.D. Cal. 2004) (awarding summary judgment in product liability claim where expert's specific causation opinion was based on "unsupported" assumptions); *see also Stephens v. Union Pacific Railroad Co.*, 935 F.3d 852, 856-57 (9th Cir. 2019) (citing *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)).  Dr. Hahn's "presumption of causation" is a "quantum leap [that] is justified by neither logic, legal precedent nor public policy" and is therefore insufficient to establish specific causation.  *See Jones*, 163 Cal. App. at 406 (affirming summary for lack of evidence of causation).

### b. Dr. Hahn Did Not Reliably Rule Out a Viral Cause of B.G.'s Injury.

Even if Dr. Hahn had reliably established that his theory of causation is possible, his opinion on specific causation should still be excluded because he has failed to reliably perform his differential diagnosis.  *See In re Roundup Prods. Liab. Litig.*, 734 F. Supp. 3d 930, 932 (N.D. Cal. 2024).  As set forth in Apple's accompanying Motion to Exclude, Dr. Hahn's purported differential diagnosis is insufficient to establish specific causation because it does not reliably exclude COVID-19 as the cause of B.G.'s injury, both because Dr. Hahn was unable to "physiologically or pathologically" rule out COVID-19 as the cause of B.G.'s hearing injury (Ex. I, Hahn Dep. at 151:2-11) and because Dr. Hahn admits that B.G.'s symptoms were identical to those of a patient suffering from COVID-19 related hearing loss.  *Id.* at 141:12-142:10.  Indeed, Dr. Hahn did not even address the testimony of B.G.'s own treating physician, who himself was unable to rule out a viral cause of B.G.'s injury.  Ex. L, Jackson Dep., Vol. 2. at 28:14-18; 31:14-19.

Because Dr. Hahn failed to "cite any literature to support his conclusions about the alternative causes that he purports to have ruled out," and did not otherwise reliably exclude viral

1    infection as the cause of B.G.'s hearing injury, it cannot be used to establish specific causation.  *See*

2    *In re Roundup Prods. Liab. Litig.*, 734 F. Supp. 3d at 933; *see also Newkirk*, 438 Fed. Appx. at 609

3    (affirming summary judgment where plaintiff's expert could not establish specific causation due to

4    failure to rule out alternative cause in differential diagnosis).

5                                                          *        *        *

6         Each of Plaintiff's claims rises and falls on the issue of causation.  Because Dr. Hahn's

7    opinions as to both general and specific causation are without adequate foundation, unreliable, and

8    are otherwise insufficient to create a triable jury issue, Plaintiff's claims should be dismissed.

9         **B.    Plaintiff's Claims Suffer from Other Failures of Proof.**

10        Although the Court need not reach any issue beyond Plaintiff's failure to advance

11   admissible evidence of general or specific causation, Plaintiff also lacks admissible evidence to

12   support other essential elements of her claims.  Given the undisputed scientific evidence that no

13   degree of hearing loss is possible from an acute exposure to sounds under 120 dB, Plaintiff will not

14   be able to prove (1) the existence of a defect—as required for her strict-liability and negligence

15   defect claims; (2) that Apple was on notice of any defect—as required for her negligence defect

16   claims; (3) that B.G.'s AirPods Pro did not conform to their intended design—as required for her

17   manufacturing defect claims; or (4) that Apple had any duty to warn about acute hearing loss—as

18   required for her failure-to-warn claims.  Plaintiff's failure-to-warn claims fail for the additional

19   reason that B.G. never read any of the product warnings, and Plaintiff's breach of warranty claims

20   fail for the same lack of proof as her defect claims.

21        **1.    Plaintiff's Negligent and Strict Liability Defect Claims Fail because**
22               **there is No Evidence of any Relevant Risk.**

23        Plaintiff cannot prove the existence of a relevant defect because, under the risk-utility test

24   that applies to her strict-liability defect claims, there is no risk of acute noise-induced hearing loss

25   against which to balance the many obvious benefits of Bluetooth headphones like AirPods Pro.

26        While California law generally permits a plaintiff to prove a strict liability defect with

27   reference to the risk-utility or consumer expectation test, *Chavez v. Glock, Inc.*, 207 Cal. App. 4th

28   1283, 1312 (2012), the consumer expectations test does not apply where, as here, the "alleged

circumstances of [a] product's failure involve technical and mechanical details about the[ir]

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1    operation [and] the effect of the product upon an individual plaintiff's health." *See Trejo v. Johnson*

2    *& Johnson*, 13 Cal. App. 5th 110, 166–67 (Cal. App. 2017).  Instead, the risk-utility test governs

3    because determining the existence of an alleged defect in AirPods Pro—and its ability to have

4    caused B.G.'s injuries—necessarily entails an examination of many highly technical factors related

5    to AirPods Pro sound output capabilities and software.  *See id; Howard v. Omni Hotels Mgmt.*

6    *Corp.*, 203 Cal. App. 4th 403, 427 (2012) (consumer expectations test inapplicable to claim that

7    bathtub was too slippery because "the application of nonslip coatings" are beyond the common

8    experience of individuals); *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 552 (1994) (holding that

9    risk utility test applies to cases where "complicated design considerations [a]re at issue" and where

10    "expert testimony [i]s necessary to illuminate" such matters).

11        Plaintiff's design defect claims against Apple fail because she cannot prove that AirPods

12    Pro are defective such that they present a risk of acute noise-induced hearing loss caused by acoustic

13    trauma.  Because an Amber alert played through B.G.'s AirPods Pro could not have caused acute,

14    noise-induced hearing loss, there is no "excessive preventable danger" against which the benefits

15    of AirPods Pro should be weighed.  *See Barker*, 20 Cal. 3d at 430); *see also Birdsong v. Apple Inc.*,

16    590 F. 3d 955, 959 (9th Cir. 2009) (affirming dismissal of claims alleging defects in iPods, where

17    plaintiffs alleged risk of hearing loss from exposure to sound levels up to 115 dB through included

18    earphones, noting district court determine no danger of hearing loss existed through ordinary use

19    of product).

20        Moreover, Plaintiff has no evidence on which a jury could conclude that Apple was on

21    notice that AirPods Pro could supposedly cause acute noise-induced hearing loss.  There has never

22    been a single case report in the medical literature of anyone *ever* sustaining even minor acute

23    hearing loss from noise level even approaching the maximum output of AirPods Pro, whether

24    involving an Amber alert or not.  *See* Ex. H, Jackler Decl. at ¶¶ 30-35; *see also* Ex. G, Fligor Dep.

25    at 216:2-217:10; Ex. I, Hahn Dep. at 49:25-50:4.  On this record, there is no evidentiary basis to

26    conclude that Apple was "on notice that [AirPods Pro] were unreasonably dangerous," given their

27    compliance with applicable safety standards and the medical impossibility of them having caused

28    the injury that Plaintiff claims.  *See Howard*, 203 Cal. App. 4th at 427–28 (granting summary

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1    judgment where product complied with applicable standards and there was a lack of sufficient prior

2    incidents to provide notice of alleged defect to manufacturer).

3         Plaintiff's primary product design expert, Dr. Casali, cannot create a triable issue as to the

4    existence of a relevant defect.  Dr. Casali has opined that AirPods Pro should have contained a

5    software-based "output limiter" that would attenuate any sound output to 100 dB.  Ex. D, Casali

6    Dep. Vol. 1 at 215:25-217:2.  But Dr. Casali has conceded that he cannot offer any opinion about

7    whether exposures above that level are capable of causing acute hearing loss in any individual.  *Id.*

8    at 50:14-51:18; 39:4-11.   In other words, without Dr. Hahn's unsupported causation opinion,

9    Plaintiff does not have a relevant defect to present to a jury.  Indeed, Dr. Casali declined to opine

10   that the failure of headphones to limit sound exposures to 100 dB represented a defect *at all* or even

11   that all headphones should be so limited.  *See* Ex. J, Casali Dep. Vol. 2, at 356:6-358:18; Ex. D,

12   Casali Dep. Vol. 1 at 215:25-216:11.  This is perhaps because Dr. Casali has done significant non-

13   litigation consulting work for Bose Corporation—a competitor of Apple from whom Dr. Casali has

14   derived significant revenue—whose own Bluetooth headphones generate an acoustic output from

15   an Amber Alert at least as loud as AirPods Pro.[7]  Ex. G, Fligor Dep. at 223:12-21.

16        Finally, Plaintiff has no evidence to rebut that the proposed alternative design is feasible.

17   As explained by Dr. Fligor, unnecessarily limiting the acoustic output of a device would have a

18   significant effect on its fidelity and compression and risks rendering such a device "unusable."

19   Ex. G, Fligor Dep. at 134:24-136:3. Because Plaintiff's proposed alternative design would result in

20   adverse consequences to the utility of the product, especially where the "likelihood of danger posed

21   by the current design is minimal," Apple is entitled to summary judgment.  *Maneely v. General*

---

[7] Notably, Apple has been unable to cross-examine Dr. Casali on the full extent of the apparent disconnect between his litigation opinions (that AirPods Pro should be designed with an output limiter to prevent acoustic outputs from exceeding, even temporarily, 100 dB, despite not having any opinion that such outputs create a risk of acute injury to users) and his non-litigation consulting work for Bose, who similarly designs and sells wireless earbuds capable of exceeding 100 dB when playing an Amber Alert.  Dr. Casali has refused to provide documentation of the audio output testing he testified that he performed on Bose headphones and refused to answer questions regarding his work for Bose on the grounds of an alleged non-disclosure agreement.  *See, e.g.*, Ex. D, Casali Dep. Vol. 1 at 296:3-12.  While not dispositive of this motion, Apple reserves the right to challenge Dr. Casali's testimony on this and other grounds.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

*Motors Corp.*, 108 F.3d 1176,1181 (9th Cir. 1997) (affirming summary judgment where proposed alternative design would negatively affect product's utility).

### 2.    Plaintiff's Inability to Establish Any Relevant Risk also Forecloses her Negligence-Based Claims.

So, too, are Plaintiff's negligence-based product liability claims foreclosed because of a Plaintiff's inability to prove the existence of a relevant defect.  "[T]he test of negligent design involves a balancing of the likelihood of harm to be expected from [a product] with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm."  *Chavez*, 207 Cal. App. 4th at 1305 (internal quotations omitted).  Therefore, a product is not negligently designed so long as "the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances."  *Barker*, 20 Cal. 3d at 434.  Because the test under a negligence theory mirrors the analysis required by the risk-utility test, *Merrill*, 26 Cal. 4th at 479–80, Apple is entitled to summary judgment for the same reasons as it is entitled to summary judgment on Plaintiff's strict liability design defect claims.  *See supra* Part II.

### 3.    There is no Evidence the Subject AirPods Pro Differed from their Intended Design, so Plaintiff Cannot Pursue her Manufacturing Defect Claim.

The Court should also grant summary judgment on Plaintiff's manufacturing defect claim, as Plaintiff lacks any evidence that the subject AirPods Pro did "not conform to the [Apple]'s intended design."  *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1121 (1996).  In this case, Plaintiff have not made—and cannot make—any such showing, as Plaintiff's primary design expert— Dr. Casali—did not even *review* the design documents and specifications applicable to AirPods Pro in formulating his opinions in this case. Ex. D, Casali Dep., 102:14-103:1.  Because Plaintiff cannot demonstrate that the subject AirPods Pro "differ[ed] from the manufacturer's intended result or from other ostensibly identical units of the same product line," Apple is entitled to summary judgment on Plaintiff's manufacturing defect claim.  *See Barker*, 20 Cal. 3d at 429; *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 754 F. Supp. 2d 1208, 1222 (C.D. Cal. 2010) (dismissing manufacturing defect claim in absence of factual allegation that product differed from other product models) (citing *Lucas*, 726 F. Supp. 2d at 1155).

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC

1

2

**4.    Plaintiff's Failure to Warn Claims Fail Absent a Particular Risk about which Apple had a Duty to Warn and because Plaintiff Cannot Prove Causation.**

3    Apple is also entitled to summary judgment on Plaintiff's failure to warn claims, whether

4    in strict liability or negligence,[8] for two separate reasons.  First, because the undisputed scientific

5    evidence establishes that there was no risk of acute noise-induced hearing loss (*supra* I.A.), Plaintiff

6    cannot show that the "particular risk" about which Plaintiff claims Apple should have warned was

7    known or knowable to Apple "in light of the generally recognized and prevailing best scientific and

8    medical knowledge." *Pannu*, 191 Cal. App. at 1316; *see also Monroe*, 766 F. Supp. 2d at 1035

9    (granting summary judgment where the plaintiff "failed to raise a material issue of fact that the

10    state of the medical literature…created a duty for defendants to warn of risk of [injury] associated

11    with [allegedly defective product].").  Second, Plaintiff's failure to warn claims independently fail

12    because B.G. testified he never read the product warnings such that any warning would have made

13    a difference.  B.G. Dep. Tr. ("B.G. Dep."), attached as Ex. S at  96:4-12.  Plaintiff is therefore

14    unable to prove causation.  *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 990 (N.D. Cal. 2014)

15    (explaining that a defendant is not liable when the person to whom the warning is directed does not

16    read the warning because, in that case, there is no causation).

17    **5.    Plaintiff's Failure of Proof on Defect Also Dooms her Warranty Claims.**

18    Finally, Plaintiff's breach of implied warranty claims fail for the same reasons as her strict

19    liability defect claims.  In cases involving personal injuries resulting from allegedly defective

20    products, "the theory of strict liability in tort has virtually superseded the concept of implied

21    warranties." *Grinnell v. Charles Pfizer & Co.*, 274 Cal. App. 2d 424, 432 (1969).  Accordingly,

22    because Apple is entitled to summary judgment on Plaintiff's defect claims, her implied warranty

23    claims also fail. *See Shepard v. Alexian Brothers Hosp.*, 33 Cal. App. 3d 606, 616 (1973) ("Since,

24

---

25    [8] Whether proceeding on a strict liability or negligence theory, Plaintiff must show that the

26    "*particular risk*" about which Plaintiff claims Apple should have warned was known or knowable to Apple "in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution." *Pannu v. Land Rover N. Am., Inc.*, 191

27    Cal. App. 4th 1298, 1316 (Cal. App. 2011) (quoting *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1002–03 (1991) (strict liability)) (emphasis added); *Rosa v. City of Seaside*, 675 F.

28    Supp. 2d 1006, 1011–12 (N.D. Cal.2009) aff'd sub nom.  *Rosa v. Taser Int'l, Inc.*, 684 F. 3d 941 (9th Cir. 2012) (negligence).

1    under the foregoing authorities, the liability imposed by strict liability in tort and breach of express

2    and implied warranties is virtually the same, i.e., a form of liability without fault, the conclusion

3    reached in the earlier discussion [regarding strict liability] is equally applicable here"); *Brown v.*

4    *Superior Court*, 44 Cal. 3d 1049, 1072 (1988) (same).

5    **V.    CONCLUSION**

6         For the reasons set forth above, Apple Inc. respectfully requests that the Court grant its

7    Motion for Summary Judgment and enter judgment in favor of Apple on all of Plaintiff's claims.

8

9    Dated: January 24, 2025                    **ARENTFOX SCHIFF LLP**

10

11                                    By: *Sara Taylor Schneider*
                                         _____

12                                        Thomas M. Crispi
                                         Sara T. Schneider
                                         Stephen Copenhaver

13
                                         Attorneys for Defendant
14                                        APPLE INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

APPLE INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
3:22-CV-02900-NC