Grigory Rchtouni (Bar No. 311412)
**CALLAHAN & BLAINE, APLC**
3 Hutton Centre Drive, 9th Floor
Santa Ana, CA 92707
714-241-4444
Fax: 714-241-4445
Email: grchtouni@callahan-law.com
*-and-*
Tej R. Paranjpe, *pro hac vice*
Jeremy Newell, *pro hac vice*
**PARANJPE MAHADASS RUEMKE LLP**
3701 Kirby Drive, Suite 530
Houston, Texas 77098
Telephone: (832) 667-7700
Facsimile: (832) 202-2018
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CARLOS GORDOA, an individual; ARIANI REYES, an individual; and B.G., a minor; <br><br> Plaintiffs, <br><br> v. <br><br> APPLE, INC., a California corporation; LUXSHARE-ICT, INC., a California corporation; and LUXSHARE PRECISION INDUSTRY CO., LTD., a Chinese Corporation; | Case No.  3:22-CV-02900-JSC <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> Judge:      Honorable Jacqueline Scott Corley <br><br> Date:       April 10, 2025 <br> Time:       10:00 a.m. <br> Location:   Courtroom 8 <br><br>  Action Filed:  May 16, 2022 |

# TABLE OF CONTENTS

INTRODUCTION & BACKGROUND FACTS.............................................................................1

OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE ...................................................2

    A.  Plaintiff objects to any evidence or testimony related to OSHA standards.........................2

    B.  Plaintiff objects to Dr. Jackler's untimely omnibus expert report. ......................................2

    C.  Dr. Jackler's causation opinions constitute unreliable expert testimony. ...........................3

ARGUMENT & AUTHORITIES ..........................................................................................4

    I.  APPLE'S SUMMARY JUDGMENT CONTENTION THAT PLAINTIFF CANNOT PROVE
CAUSATION FAILS WITH IT'S MOTION TO EXCLUDE PLAINTIFF'S CAUSATION EXPERT .......4

        A.  Plaintiff's Causation Expert, Dr. Hahn, Used a Widely Accepted Method of
Differential Diagnosis to Arrive at his Causation Opinions ...................................5

        B.  Apple Cannot Manufacture a General Causation Discrepancy .............................10

    II.  APPLE'S REMAINING CONTENTIONS ARE ALMOST EXCLUSIVELY THAT PLAINTIFF HAS
NO EVIDENCE OF A "RELEVANT RISK," WHICH IS DEPENDENT ON DR. HAHN'S
EXCLUSION, AND ALL FAIL. ..........................................................................................13

        A.  Plaintiff has Evidence to Support her Strict Liability Design Defect Claims. ......13

            1.  Apple's conclusory assertion that the Risk Utility Test Applies in this
Case Fails. .............................................................................................13

            2.  Plaintiff's Experts, Dr. Hahn, Dr. Tarr, and Dr. Casali, each provide
testimony and evidence to overcome Apple's no-evidence challenge
to the strict liability design defect claims. ...................................................16

                a.  Apple Ignores the Finding of Dr. Tarr. ......................................16

                b.  Apple misrepresents the opinions and testimony of Dr. Casali .... 17

            3.  Apple's no-evidence attack on the evidence of a feasible design is
misplaced and, regardless, wrong. ............................................................18

        B.  Plaintiff has Evidence to Support her Negligence Claims....................................19

        C.  Plaintiff has Evidence to Support her Strict Liability Claims for Failure to
Warn Claims. ........................................................................................20

        D.  Plaintiff has Evidence to Support her Warranty Claims.........................................22

CONCLUSION....................................................................................................22

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 255 (1986)...................................................................................4

5

6

*Barker v. Lull Eng'g Co.*,
    20 Cal. 3d 413 (1978) .........................................................................14, 15, 18, 19

7

8

*Cabrera v. Cordis* Corp,
    134 F.3d 1418 (9ᵗʰ Cir. 1998) ...........................................................................2

9

10

*California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir.1987) ...........................................................................4

11

12

*Camacho v. JLG Indus. Inc.*,
    93 Cal. App. 5th 809 (2023)...............................................................................22

13

14

*Campbell v. Gen. Motors Corp.*,
    32 Cal. 3d 112 (1982) .........................................................................................22

15

16

*Canifax v. Hercules Powder Co.*,
    237 Cal. App. 2d 44 (1965) ...............................................................................22

17

18

*Clausen v. M/V NEW CARISSA*,
    339 F.3d 1049 (9th Cir.2003) ...................................................................7, 10, 11

19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...........................................................................................4

20

21

*Cook v. Baker Equipment Engineering Co.*,
    582 F.2d 862 (4th Cir.1978) ...............................................................................4

22

23

*Constance B. v. State of California*,
    178 Cal.App.3d 200 (Cal.Ct.App.1986) ...........................................................5

24

25

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).............................................................................................2

26

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .............................................................................11

27

28

*Dominguez v. Excel Mfg. Co. Inc.*,
   No. C-09-03611 EDL, 2010 WL 4698739 (N.D. Cal. Nov. 8, 2010) ..............................19

*Enborg v. Ethicon, Inc.*,
   No. 220CV02477AWIBAK, 2022 WL 800879 (E.D. Cal. Mar. 16, 2022) ......................5

*Heller v. Shaw Indus., Inc.*,
   167 F.3d 146 (3d Cir. 1999)..........................................................................................11

*Howard v. Omni Hotels Mgmt. Corp.*,
   203 Cal. App. 4th 403 (2012) .......................................................................................14

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
   *Sales Practices & Products Liab. Litig.*,
   754 F. Supp. 2d 1208 (C.D. Cal. 2010) .......................................................................20

*Kim v. Toyota Motor Corp.*,
   6 Cal. 5th 21 (2018) .....................................................................................................18

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997).......................................................................................................3

*Grinnell v. Charles Pfizer & Co.*,
   274 Cal. App. 2d 424 (Ct. App. 1969)..........................................................................14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................................................4

*McCabe v. American Honda Motor Co.*,
   100 Cal. App. 4th 1111 (2002) ...............................................................................14, 15

*Messick v. Novartis Pharm. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) .....................................................................................5, 9

*Rushing v. Kansas City S. Ry. Co.*,
   185 F.3d 496 (5th Cir. 1999) ..........................................................................................6

*Paul v. Holland Am. Line, Inc.*,
   No. C05-2016RSM, 2006 WL 3761368 (W.D. Wash. Dec. 21, 2006) ........................4, 8

*Pike v. Frank G. Hough Co.*,
   2 Cal. 3d 465 (1970)....................................................................................................19

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ........................................................................................13

*Platt v. Holland Am. Line Inc.*,
   No. 2:20-CV-00062-JHC, 2023 WL 2938172 (W.D. Wash. Apr. 13, 2023) ........4, 6, 7, 13

*Rosales v. Rollag*,
   No. CV-22-01581-PHX-DJH, 2024 WL 4290758 (D. Ariz. Sept. 25, 2024) ...................8

*Saller v. Crown Cork & Seal Co., Inc.*,
   187 Cal. App. 4th 1220 (2010) ...............................................................14, 15, 20

*Seely v. White Motor Co.*,
   63 Cal. 2d 9 (1965) ...................................................................................14

*Shepard v. Alexian Bros. Hosp.*,
   33 Cal. App. 3d 606 (Ct. App. 1973) .............................................................14

*State Dep't of State Hosps. v. Super. Ct.*,
   61 Cal. 4th 339 (2015) ...............................................................................5

*Steinle v. United States*,
   17 F.4th 819 (9th Cir. 2021) .........................................................................5

*Turner v. Iowa Fire Equip. Co.*,
   229 F.3d 1202 (8th Cir. 2000) .....................................................................11

*Trump v. Intuitive Surgical Inc.*,
   No. 18-CV-06413-LHK, 2020 WL 1976499 (N.D. Cal. Apr. 24, 2020) .........................13

*United States v. Diebold, Inc.*,
   369 U.S. 654 (1962)....................................................................................4

*Varas v. Barco Mfg. Co.*,
   205 Cal.App.2d 246 (1962) .........................................................................19

*Vickers v. United States*,
   228 F.3d 944 (9th Cir. 2000) .........................................................................5

*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227, 1237 (9th Cir. 2017) ..............................................................10

*Westberry v. Gislaved Gummi AB*,
   178 F.3d 257 (4th Cir. 1999) ....................................................................7, 10

**Statutes**

U.S.C.A. §653(a) .........................................................................................2

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### INTRODUCTION & BACKGROUND FACTS

Defendant Apple, Inc.'s ("Apple") Motion for Summary Judgment, *see* Dkt. 196, (the "Motion for Summary Judgment"), is almost entirely premised upon the arguments presented in its Motion to Exclude the Causation Opinions, *see* Dkt. 197 (the "Motion to Exclude"), which it filed simultaneously. Accordingly, Plaintiff incorporates by reference its Response in Opposition to Apple's Motion to Exclude as if full forth herein.

Just as in its Motion to Exclude, Apple selectively ignores and mischaracterizes the testimony provided by Plaintiff's experts in an attempt to show that the Amber Alert being played through an AirPod Pro in B.G.'s right ear for 10-11 seconds (the "Amber Alert Event"), after which he immediately complained of pain and hearing loss in his right ear, was more likely caused by COVID, despite the absence of a positive COVID-19 test and absence of any symptoms of COVID-19 infection leading up to the Amber Alert event. These liberties that Apple take in its Motion for Summary Judgment and evident from the very beginning, using its factual background as an opportunity for to provide a treatise on its own experts' opinions—an odd tactic given the no-evidence nature of its summary judgment claims. However, Apple cannot reframe the facts and avoid a trial in this case by asking this Court to decide questions of material facts and disputes between experts, which should be left for the jury decide.

The facts in this case are much simpler than Apple presents and are undisputed. On May 17, 2020, B.G. was wearing one AirPod Pro, an in-ear-headphone that seals the ear canal, in his right when an Amber Alert played for 10–11 seconds and, immediately thereafter, experienced pain and hearing loss in his right ear, as well as dizziness, nausea, vertigo, and tinnitus. *See* Ex. 20, B.G. Depo., at 158:3–162:8; Mot. Summ. J. at 5:2–6; Ex. 1, Hahn Rpt. at 2–4. On May 19, 2020, B.G. was diagnosed with sudden onset hearing loss in his right ear by his pediatrician, which was confirmed two days later by Dr. Lance Jackson, a board-certified otolaryngologist and neurotologist, who diagnosed B.G. with a "profound level of hearing loss" in his right ear, vertigo, and tinnitus. *See* Ex. 1, Hahn Rpt. at 2; Ex. 5, Jackson Depo–Feb. 2024, at 12:5–17; Mot. Summ. J. at 5:2–6; Mot. to Exclude at 3:17–21.

## OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

### A.  Plaintiff objects to any evidence or testimony related to OSHA standards.

Apple's retained experts, Robert Jackler and Brian Fligor, offer opinions about OSHA standards to justify Apple's failure to satisfy the applicable certification standards that regulate listening devices, such as the AirPods Pro (1st generation). The OSHA standards in Apple's summary judgment motion apply to workplace injuries only. B.G.'s exposure to the Amber Alert transmission occurred at the age of 12 years old while he, and his family members, traveled in the family car to a recreational activity.

OSHA regulations are narrowly tailored to address workplace safety concerns that arise in specific industry settings. OSHA does not exercise authority over the sale of consumer goods to private parties. *See* OSHA Standards Interpretation1975.3, published on October 17, 2001. Instead, OSHA regulates employee injuries that occur in the workplace. *See* Occupational Safety & Health Act of 1970, U.S.C.A. §653(a).

The United State Supreme Court emphasized in its seminal case related to expert testimony that a witness's expert opinions must "fit" the facts of the case to be relevant and admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).  In *Cabrera v. Cordis Corp.*, the court excluded expert testimony that did not align with the facts of the underlying case. 134 F.3d 1418, 1423 (9th Cir. 1998)

The opinions of Dr. Jackler and Dr. Fligor do not align with the facts of this case.  B.G.'s hearing loss occurred while he used a consumer product in the family car.  Plaintiff objects to the admissibility of any opinions based on OSHA standards under Federal Rules of Evidence 401–403.

### B.  Plaintiff objects to Dr. Jackler's untimely omnibus expert report.

Plaintiffs object to the Declaration of Robert K. Jackler, MD filed on January 24, 2025 to support Apple's dispositive motions. Dr. Jackler appears in this case as Apple's retained expert witness at the rate of $1,000 per hour.

During the discovery period, Dr. Jackler timely issued two reports.  The first report, dated May 31, 2024, addressed his physical examination of Plaintiff, BG. The 12-page report did not use any visual aids or medical illustrations. The second report, dated September 6, 2024, addressed Dr. Jackler's purported expert opinions. The 19-page report used two visual aids and no medical illustrations.  Plaintiff's counsel deposed Dr. Jackler on October 28, 2024. Apple's counsel chose not to ask Dr. Jackler a single question at his deposition.

On the other hand, Dr. Jackler's supposed declaration spans 53 pages, includes 136 numbered paragraphs and 111 footnotes, and relies on 30 visual aids and medical illustrations. Instead of a witness declaration, Apple submitted a third expert report disguised as a declaration to support its dispositive motions.

Plaintiff objects to Dr. Jackler's third expert report as untimely and moves to strike the declaration from the summary judgment evidence. When asked at his deposition whether he intended to perform any further work in the case, Dr, Jackler testified that he had "no request pending."  *See* Ex. 21 Jackler, at 81:13. Three months later, Apple's counsel filed the omnibus expert report with opinions and conclusions that were not timely disclosed.

**C.  Dr. Jackler's causation opinions constitute unreliable expert testimony.**

In addition to the untimeliness of Dr. Jackler's omnibus expert report, Plaintiff timely filed on January 24, 2025, a motion to exclude Dr. Jackler's causation opinion testimony.  *See* Dkt. 195, Pl.'s Mot. to Exclude Testimony of Robert Jackler, MD. Plaintiff incorporates by reference the arguments made in the previous motion as if fully set forth.  The same arguments apply here.

Among the many opinions Dr. Jackler offers, the prevailing opinion appears to be that a mystery viral ear infection, specifically COVID-19, caused Plaintiff's permanent right-sided hearing loss. However, no information in B.G.'s medical or personal history supports Dr. Jackler's opinion. As presented in Plaintiff's motion to exclude Dr. Jackler's testimony, unsupported speculation constitutes unreliable *ipse dixit* guesswork.  *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Nothing requires this Court to admit opinion testimony based on the expert's *ipse dixit* guesswork.  *See id.*

Plaintiff moves to exclude Dr. Jackler's omnibus report because his *ipse dixit* on the causation issue constitutes unreliable summary judgment evidence

### ARGUMENT & AUTHORITIES

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When considering the motion, the Court must view the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" that are not appropriate on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where, as here, the moving party seeking summary judgment by alleges merely that the non-moving party lacks evidence to support its case, the non-moving party must set forth specific facts to show a genuine issue for trial, which must be taken as true, and with justifiable inferences being drawn in the nonmoving party's favor. *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

If "a reasonable jury could return a verdict for the nonmoving party," the summary judgment is not appropriate. *Anderson*, 477 U.S. at 248. "Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment. *Paul v. Holland Am. Line, Inc.*, No. C05-2016RSM, 2006 WL 3761368, at *1 (W.D. Wash. Dec. 21, 2006) (citing *California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987)).

### I.    APPLE'S SUMMARY JUDGMENT CONTENTION THAT PLAINTIFF CANNOT PROVE CAUSATION FAILS WITH IT'S MOTION TO EXCLUDE PLAINTIFF'S CAUSATION EXPERT.

It is widely agreed that "[c]ausation is typically a question of fact to be resolved by a jury." *Platt v. Holland Am. Line Inc.*, No. 2:20-CV-00062-JHC, 2023 WL 2938172, at *5 (W.D. Wash. Apr. 13, 2023); *see Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206, 1209 (W.D. Wash. 2003) (citing *Cook v. Baker Equipment Engineering Co.,* 582 F.2d 862, 865 (4th Cir.1978)) ("In negligence cases, questions concerning foreseeability and causation particularly lend

themselves to decision by a jury."); *Vickers v. United States*, 228 F.3d 944, 953 (9th Cir. 2000) (alterations in original) (quoting *Constance B. v. State of California*, 178 Cal.App.3d 200, 207–08 (Cal.Ct.App.1986)) ("[B]asic causation-related issues involve questions of fact, unless reasonable [persons] will not dispute the absence of causality.").

Apple's Motion for Summary Judgment seeks to avoid this common understanding and outcome and, instead, seeks uncommon relief but cannot obtain it because the facts in this case are not "such that the only reasonable conclusion is an absence of causation;" thus, "the question is one of law, not of fact." *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021) (quoting *State Dep't of State Hosps. v. Super. Ct.*, 61 Cal. 4th 339, 353 (2015)). Apple's first argument effectively provides a summary of its deficient Motion to Exclude, which amounts to the approach that Plaintiff's expert opinions on causation should be struck, and, in turn, summary judgment should be granted. *See* Mot. Summ. J., § IV. However, as Plaintiff has laid out in its Response in Opposition to Apple's Motion to Exclude and provide evidence again here, Plaintiff's expert, Dr. Hahn, formed his opinions by way of a reliable differential diagnosis, which led him to the conclusion that a combination of acoustic shock and perilymphatic fistula sustained from the Amber Alert event resulted in B.G.'s dizziness, nausea, vertigo, tinnitus, and hearing loss in his right ear. *See* Ex. 3, Hahn Depo., at 119:10–25.

### A. Plaintiff's Causation Expert, Dr. Hahn, Used a Widely Accepted Method of Differential Diagnosis to Arrive at his Causation Opinions.

Because Dr. Hahn has performed a reliable differential diagnosis, and relied on his extensive experience as a board-certified otolaryngologist and neurotologist, his opinions meet the requirements of Rule 702, and Apple's Summary Judgment must be denied. *See Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) (reversing trial court's grant of summary judgment because expert's differential diagnosis regarding causation because the "expert testimony creates a genuine issue of material fact regarding the specific causal link between Messick's bisphosphonates treatment and her development of ONJ."); *see also Enborg v. Ethicon, Inc.*, No. 220CV02477AWIBAK, 2022 WL 800879, at *21 (E.D. Cal. Mar. 16, 2022) (denying summary judgment because "that a reasonable jury could find such a causal connection based on

the differential diagnosis Dr. Ostergard conducted with respect to conditions at issue in this case."); *Platt*, No. 2:20-CV-00062-JHC, 2023 WL 2938172, at *9 ("Platt's medical providers are well-credentialed experts in their fields. They have expressed opinions—to varying degrees of specificity—that Platt's symptoms were caused by the incident. This creates a genuine issue of fact suitable for resolution by a jury.").

First, Dr. Hahn is more than qualified to provide his causation opinion. *See* Pl's Resp. to Mot. to Exclude, § I. A; *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) ("As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity."). He is board certified in otolaryngology as well as neurotology, actively practices in those specialized fields, with the vast majority of his practice spent in client practice treating patients with hearing loss. *See* Ex. 4, Hahn Decl., ¶¶ 1–5; Ex. 3, Hahn Depo. at 195: 5–8 His opinions in this case are supported by the knowledge he has gained from seeing "thousands of patients" during his client practice across more than two decades of practice, which involves diagnosing patients with a wide range of symptoms from hearing loss. *See* Ex. 3, Hahn Depo. at 113:14–16; Ex. 4, Hahn Decl., ¶¶ 4, 12.

Second, Plaintiff's experts place considerable importance on the evidence that Apple conveniently ignores—the temporal relationship between the Ambert Alert event and the onset of B.G.'s symptoms. *See* Pl.'s Resp. to Mot. to Exclude, § I. B. 1. The temporal consideration of this injury is major factor, as agreed by both Dr. Hahn and B.G's treating doctor, Dr. Jackson—who is also a board-certified otolaryngologist and neurotologist. *See* Ex. 1, Hahn Rpt. (summarizing his causation opinions as based, in part, on the "contemporaneity and indeed temporal nature that existed between the exposure and the onset of his symptoms"); Ex. 3, Hahn Depo., at 67:18–23; *id*. at 199:18–23; Ex. 6, Jackson Depo–March 2024, at 31:1–6; *id*. at 58:5–16 ("Q. So if a, for example, if a patient comes to you after a sudden significant noise exposure and immediately afterwards they have a -- they report hearing loss and dizziness and tinnitus, and previously, they had no issues with hearing loss -- they had all prior hearing tests showed normal hearing -- you would agree that that would indicate that the acoustic event, the noise exposure is what caused

their hearing loss. Correct? . . . [Dr. Jackson]: It would be a strong likelihood.").

While Apple and its experts may disagree, courts do not. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir.2003) ("[w]hile the mere fact that two events correspond in time and space does not *necessarily* mean they are causally related, a 'temporal relationship between exposure to a substance and the onset of a disease . . . can provide compelling evidence of causation.'" *Clausen*, 339 F.3d at 1059 (emphasis in original) (alterations in original) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)); *Platt*, No. 2:20-CV-00062-JHC, 2023 WL 2938172, at *7 ("When the temporal proximity of the injury and the onset of symptoms is so immediate (here, less than a day for some symptoms) and the type of injury is so acute, the inference of causation becomes substantially more reasonable.").

Third, Dr. Hahn's differential diagnosis ruled out all potential causes, just as the law requires. *See* Pl.'s Resp. to Mot. to Exclude, § I. B. 3; *See Clausen,* 339 F.3d at 1057–58 (emphasis in original) ("The first step in the diagnostic process is to compile a comprehensive list of hypotheses," looking to "which of the competing causes are *generally* capable of causing the patient's symptoms or mortality," followed by "a process of elimination, . . . to reach a conclusion as to the most likely cause of the findings in that particular case."). Dr. Hahn starting this process by identifying five potential diagnoses. *See* Ex. 1, Hahn Rpt. at 5–7 (evaluating acoustic trauma, acoustic shock, perilymph fistula, post traumatic Meniere's disease, and viruses as potential causes capable of causing B.G.'s symptoms).

Apple does not challenge Dr. Hahn's ruling out of acoustic trauma or post traumatic Meniere's disease,[1] nor does Apple complain that Dr. Hahn failed to identify other potential cause or diagnoses from his initial list. Rather, Apple fixates on its unfounded conclusion that COVID caused B.G.'s hearing loss and other injuries and then makes the illogical leap that Dr. Hahn could not or did not sufficiently rule out COVID or other viral causes of hearing loss. This is simply not the case, because, while Dr. Hahn acknowledges viruses can be a cause of hearing loss (*see* Ex. 1,

---

[1] To be clear, Dr. Hahn provide his explanations for ruling out both acoustic trauma and post traumatic Meniere's disease. *See* Ex. 1, Hahn Rpt. at 5; Ex. 3, Hahn Depo., at 17:9–15, 18:9–15; Ex. Ex. 3, Hahn Depo., at 9:15–19, 11:11–17, 105:13–16.

Hahn Rpt. at 8; Ex. 3, Hahn Depo., at 20:10–21:5), he also explained that he ruled out a viral cause because prior to the Amber Alert event, "B.G. did not have a cough, fever, or weakness that may have heralded a COVID-19 infection or other viral illness," nor prior hearing loss, dizziness, tinnitus, other otologic symptoms. Ex. 1, Hahn Rpt. at 8; *see* Ex. 2, Hahn Supp. Rpt. at 1.

By insisting that its expert's opinion that COVID caused B.G.'s injuries, rather than Dr. Hahn's opinion that acoustic shock and perilymphatic fistula sustained from the Amber Alert event resulted in B.G.'s injuries, Apple seemingly argues that in some general sense, its experts' opinion further establish Plaintiff's alleged failure to establish medical causation. However, Apple fails to explain, to any degree, how considering these opinions on the merits would be anything other than improperly weighing the evidence on a motion for summary judgments. *See Paul*, No. C05-2016RSM, 2006 WL 3761368, at *5 (holding that defendant was not entitled to summary judgment when its expert disagreed with the plaintiff's expert over medical causation, which "go[es] to the weight, not the admissibility, of the experts' testimony."); *Rosales v. Rollag*, No. CV-22-01581-PHX-DJH, 2024 WL 4290758, at *5 (D. Ariz. Sept. 25, 2024) ("To the extent Defendant argues he did not "adequately rule out" alternative causes for Plaintiff Rosales' injuries, this is a credibility determination that goes to the weight of his opinions, not their admissibility.").

Fourth, Dr. Hahn provided extensive details regarding his determination that a combination of the two remaining diagnoses, acoustic shock and perilymphatic fistula, which were sustained from the Amber Alert event, resulted in B.G.'s dizziness, nausea, vertigo, tinnitus, and hearing loss in his right ear. *See* Pl.'s Resp. to Mot. to Exclude, § I. B. 3; Ex. 3, Hahn Depo., at 119:10–25. Dr. Hahn and Dr. Jackson also have also both testified that acoustic shock and perilymphatic fistula are two different diagnoses that can occur within the same patient and that diagnosis of both requires a complete evaluation of the patient's complete circumstances, including the varying susceptibility of patients to acoustic noises. *See* Ex. 3, Hahn Depo., at 92:11–11, 92:23–93:2, 93:16–19, 94:17–21, 211:15–23; Ex. 6, Jackson Depo.–March 2024, at 25:23–26:1, 29:15–16.

Moreover, Dr. Hahn has also specifically addressed, B.G.'s diagnosis of acoustic shock and perilymphatic fistula can account for B.G.'s symptoms of dizziness, nausea, vertigo, tinnitus, and hearing loss, while perilymphatic fistula that resulted from the Amber Alert even can, and did,

cause B.G.'s hearing loss. *See* Ex. 1, Hahn Rpt., at 5–7; Ex. 3, Hahn Depo., at 19:3–6, 27:24–25, 36:14–20, 38:20–39:1, 64:4–6, 51:24–52:17, 75: 14–18, 76:17–77:10, 113:14–16, 120:10–17; *cf. Koho v. Forest Labs., Inc.*, No. C05-667RSL, 2015 WL 11201281, at *3 (W.D. Wash. Mar. 31, 2015) ("Importantly, where an expert is offering an opinion in a matter of medical science, his differential diagnosis may be reliable even where he cannot conclusively rule out all but one explanation as the sole cause for a condition.").

Despite Apple's repeated aims to undermine Dr. Hahn's testimony, he also provided consistent testimony regarding the fact that a particular decibel level is not required in his evaluation of the perilymphatic fistula as cause of B.G.'s hearing loss:

> [W]hat we know is that perilymph fistula can occur in many settings. It can occur, like we talked about, from penetrating trauma, it can occur from blunt trauma, it can occur from baro trauma, it can occur from activities such as scuba diving, weightlifting, it can occur from acoustic trauma. What I don't have is a number that causes perilymphatic fistula, meaning if I see a patient that is a weightlifter and he only lifted 100 pounds and not 200 pounds, even though the literature only shows that 200 pounds -- if there's case reports of 200 pounds, then I still would diagnose him with a perilymph fistula if, when he comes to see me, his symptoms are such that it -- that I -- that I -- that my diagnosis is a perilymphatic fistula. So that's the basis of my diagnosis.

*Id.* 91:17–92:6; *see id.* at 103:8–14, 196:9–15; *see also* Ex. 6, Jackson Depo–March 2024, at 58:5–16 ("Q. So if a, for example, if a patient comes to you after a sudden significant noise exposure and immediately afterwards they have a -- they report hearing loss and dizziness and tinnitus, and previously, they had no issues with hearing loss -- they had all prior hearing tests showed normal hearing -- you would agree that that would indicate that the acoustic event, the noise exposure is what caused their hearing loss. Correct? . . . [Dr. Jackson]: It would be a strong likelihood."); .

Regardless of Apple's countless disagreements, there can be no dispute that Dr. Hahn, having practiced in otolaryngology and neurotology for nearly 20 years, conducted a thorough review of B.G.'s medical records and literature, as well as a personal evaluation of B.G. that included discussion of the circumstances and significant testing, and given the exceptional detail with which he has described his methods above, conducted a reliable differential diagnosis. *See* Ex. 1, Hahn Rpt., at 2–4; Ex. 4, Hahn Decl., ¶ 11–12; *see also Messick*, 747 F.3d at 1198 ("[M]edicine partakes

of art as well as science, and there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis.")

Apple simply cannot transform its disagreement with Plaintiff's experts into a legal bar of Plaintiff's causation evidence. "Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, exclusion is not appropriate and "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

**B. Apple Cannot Manufacture a General Causation Discrepancy.**

As addressed in detail in Plaintiff's Response to Apple's Motion to Exclude (*see* §§ I. B. 3–C) and above (*see supra* § I. A), Dr. Hahn has provided testimony that a perilymphatic fistula can generally cause hearing loss and based on his experience, personal evaluation of B.G, and review of the evidence and literature, that a perilymphatic fistula caused B.G.'s hearing loss. *See id*. at 64:4–6, 119:10–25. Nonetheless, while ignoring the blatant temporal consideration—that without any prior symptoms of hearing loss or tinnitus, an Amber Alert played through the AirPod Pro in B.G.'s right ear, and he immediately experienced a hearing in his right ear—Apple insists that Dr. Hahn's testimony is insufficient because Dr. Hahn "lacks any reliable to basis to offer a general causation opinion." Mot. Summ. J. at 15:22–23.

Moreover, even assuming *arguendo* that Dr. Hahn's opinions were not sufficient to address general causation, Apple nearly ignores the widely accepted principal that a "reliable differential diagnosis alone may provide a valid foundation for a causation opinion, even when no epidemiological studies, or laboratory data are offered in support of the opinion." *Clausen*, 339 F.3d at 1060 (citing *Westberry*, 178 F.3d at 262). Apple's attempt to disclaim this long, well reasoning line of authority can be found in two brief, underwhelming, and nearly identical footnotes its Motion for Summary Judgment (at 17, n. 6) and its Motion to Exclude (at 18, n. 6).

As the *Clausen* court clarified, and its progeny has reinforced, even the complete absence of peer-reviewed studies does not prevent the sufficiency of a medical expert's differential diagnosis:

> We do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness. The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed. If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted.

*Clausen*, 339 F.3d at 1060 (quoting *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208–9 (8th Cir. 2000) (holding "[t]he fact that the minimum threshold level of oil necessary to cause harm to shellfish has not yet been established with any degree of certainty does not render Dr. Elston's evaluation mere guesswork, as the shipowners argue.").; *see Heller*, 167 F.3d at 157 (holding that even "absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness."); *Wendell*, 858 F.3d at 1236 (citing *Kennedy*, 161 F.3d at 1229) ("The district court also wrongfully required that the experts' opinions rely on animal or epidemiological studies. Neither are necessary for an expert's testimony to be found reliable and admissible."); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 n. 9 (9th Cir. 1995) ("*Daubert II*") (""There may well be good reasons why a scientific study has not been published. For example, it may be too recent or of insufficiently broad interest.").

Instead of addressing this head on, Apple summarily concludes that Dr. Hahn's opinions are insufficient because "there is substantial academic and medical literature on the issue of causation." Mot. Summ. J. at 18, n. 6. However, Apple refers to nothing in its motions that concerns the effect of an acoustic sound through any type of headphone, much less an AirPod Pro that sits in the ear and seals the ear canal. *See* Mot. Summ. J. at 7:3–16 (referring to OSHA guidelines for "continuous noise exposure"). In fact, the only instances of cases related specifically to any type of headphones are those cited by Dr. Hahn regarding the study of the new diagnosis, acoustic shock in which the very first report of acoustic shock was related to "call center operators experiencing a wide range of symptoms including pain, tinnitus, vestibular disturbance, and hyperacusis." *See*  Ex. 1, Hahn Rpt.  at 6; *see* Ex. 3, Hahn Depo., at 49:1–14.

Dr. Hahn acknowledges that both of the diagnoses that he identifies as the cause of B.G.'s injuries are unique and that literature specific to their application in this case is limited to date. *See* Ex. 2, Hahn Supp. Rpt. at 2 (rebutting Apple's expert Dr. Jackler's purported skepticism of acoustic shock and addressing that "[w]hile it is accurate that the diagnosis is relatively new . . . There are many diseases that were thought 'not to exist' that with time were proven to have a physiologic cause."); Ex. 3, Hahn Depo., at 29:5 ("Acoustic shock is a newer diagnosis, yes."); Ex. 2, Hahn Supp. Rpt. at 2 ("There are not many reports of noise-induced perilymph fistula, but it is known that an acoustic stimulus can cause enough movement of the oval window to damage it."); Ex. 3, Hahn Depo., at 51:24–52:17.

Plaintiff has presented extensive evidence regarding the unique nature of diagnosing inner-ear issues, the varying susceptibility of patients, and the novelty of the AirPods Pro, which seal, and deliver noise directly to, the ear canal. *See* Ex. 2, Hahn Supp. Rpt. at 2 (clarifying that "[w]e must remember that this was from a speaker in the room, not from an in the ear occlusive microphone that delivered the sound directly to the eardrum, as it did in [B.G.]'s incident."); Ex. 3, Hahn Depo., at 103:8–14 ("I think that every inner ear is very unique as well and I think that the -- the -- where the sound is coming from, is it coming from, you know, outside of the room, is it coming from inside the room, is it coming from inside of your ear? I think that all has impact on how your inner ear will respond."); Ex. 1, Hahn Rpt. (referring to the AirPod Pro "that seals" as part of the consideration in diagnosis); Ex. 6, Jackson Depo–March 2024, a 25:23–26:1 ("I would say there is – what's reported in the literature as the expected amount that every patient's anatomy and susceptibility could be slightly different. So there could be some variations from patient to patient.").

Given the unique nature of the diagnoses and inner-ear, the novel nature of the AirPods Pro, and the lacking literature specific to those novelties to date, Dr. Hahn presented more than sufficient evidence to support his opinion that a perilymphatic fistula can *generally* cause hearing loss, and that it along with acoustic shock caused all of B.G.'s symptoms including his hearing loss. *See id.* at 64:4–6, 119:10–25. Apple may make their disagreement known during "cross examination, with contrary evidence, and at closing argument, but not with exclusion" and not

with summary judgment. *Trump v. Intuitive Surgical Inc.*, No. 18-CV-06413-LHK, 2020 WL 1976499, at *4 (N.D. Cal. Apr. 24, 2020) (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010)); *Platt*, No. 2:20-CV-00062-JHC, 2023 WL 2938172, at *9 (denying summary judgment based on causation experts' differential opinion and explaining that "[a]t trial, Platt's experts will be required to provide their causation opinions under oath. Their methodologies and opinions may be rigorously tested through cross-examination.").

## II.    APPLE'S REMAINING CONTENTIONS ARE ALMOST EXCLUSIVELY THAT PLAINTIFF HAS NO EVIDENCE OF A "RELEVANT RISK," WHICH IS DEPENDENT ON DR. HAHN'S EXCLUSION, AND ALL FAIL.

Apple's Motion for Summary Judgment purports to advance further summary judgment arguments beyond the causation issues it raised to Dr. Hahn's testimony. However, with very little exception, Apple's further arguments (*see* Mot. Summ. J., § IV. B) amount to little more than rephrasing their misguided "general cause" arguments as allegation that Plaintiff has no evidence of "relevant risk." This distinction is one without a difference and, accordingly, these series of no-evidence challenges should be denied as well.

### A.  Plaintiff has Evidence to Support her Strict Liability Design Defect Claims.

Each of Apple's assertions that Plaintiff's strict liability design defect claims fail are flawed, misguided, and mischaracterizing. Even moving past Apple's repetitive argument premised on its Motion to Exclude, Apple outright ignores the expert opinion and testimony of Dr. Eric Tarr, whose testimony, along with that of Dr. Casali and Dr. Hahn, provide more than enough evidence to overcome Apple's no-evidence summary judgment challenge.

#### 1.    Apple's conclusory assertion that the Risk Utility Test Applies in this Case Fails.

It should first be noted that, in making its conclusory assertions regarding the applicable law and requirements, Apple grossly mischaracterizes the legal standards required to prove a strict liability claim for a defective design in two main ways. *See* Mot. Summ. J., § B. 1. First, it is simply not true that that a production liability claim for a defective design claim requires notice. "[T]he doctrine of strict liability is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and

limitations through inconsistencies with express warranties." *Shepard v. Alexian Bros. Hosp.*, 33 Cal. App. 3d 606, 614–15, (Ct. App. 1973) (citing *Grinnell v. Charles Pfizer & Co.*, 274 Cal. App. 2d 424, 432 (Ct. App. 1969)); *see Seely v. White Motor Co.*, 63 Cal. 2d 9, 29 (1965) (Peters, J. concurring) ("To sum up, all the strict liability rule does to implied warranty law is abolish the notice requirement, restrict the effectiveness of disclaimers to situations where it can be reasonably said that the consumer has freely assumed the risk, and abolish the privity requirement, where ordinary consumers are involved."). In the case Apple purportedly relies on for this supposed notice requirement, *Howard v. Omni Hotels Mgmt. Corp.*, the court is actually discussing the sufficiency of expert testimony regarding the industry safety standards and feasible alternative design as part of a slip-in-fall, premises liability case, in which a product liability claim was also brought regarding the "antislip coating" on a bathtub. 203 Cal. App. 4th 403 (2012).

Second, Apple vastly oversimplifies the determination of the application of the consumer expectations tests or the risk utility test, the two tests that exist for a strict liability claims of design defect, both of which "may be presented to the jury." *Saller v. Crown Cork & Seal Co., Inc.*, 187 Cal. App. 4th 1220, 1232 (2010) (citing *McCabe v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 1126 (2002)); *see Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 430 (1978).

The consumer expectations test exists because the "[t]he purposes, behaviors, and dangers of certain products are commonly understood by those who ordinarily use them." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 566 (1994). Thus, where the facts permit the conclusion that ordinary knowledge of the product's characteristics "may permit an inference that the product did not perform as safely as it should" and "resulted from the product's design" then "a finding of defect is warranted without any further proof." *Id*. However, "the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; ***a complex product 'may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers*.'"** *Saller*, 187 Cal. App. 4th at 1232 (emphasis added) (quoting *Soule*, 8 Cal. 4th at 566).

On the other hand, "when the ultimate issue of design defect calls for a careful assessment of feasibility, practicality, risk, and benefit," the risk utility test is deemed appropriate. *Soule*, 8

Cal. 4th at 566. Under the risk-utility test, "the plaintiff may establish the product is defective by showing that its design proximately caused his injury and the defendant then fails to establish that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." *Saller*, 187 Cal. App. 4th 1220, 1233 (2010) (citing *Barker*, 20 Cal. 3d at 432). The factors to be evaluated by the jury would include "the gravity of the danger posed by the design, the likelihood such danger would occur, the feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the consumer resulting from an alternative design." *Id*. (citing *Barker*, 20 Cal. 3d at 431).

Although Apple claims that the risk-utility test applies because determining whether the product is defective and that cause of B.G.'s injuries "entails an examination of many highly technical factors related to AirPods Pro sound output capabilities and software." Mot. Summ. J. at 2:5. However, those are not answers to the right question. Causation, which has been discussed *ad nauseum* (*see supra* § I; Pl's Resp. to Mot. to Exclude § I) is a requirement regardless of which test applies, and Apple's analysis presupposes the answer it wants. "The critical question, in assessing the applicability of the consumer expectation test, is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, *in the context of the facts and circumstances of its failure,* is one about which the ordinary consumers can form minimum safety expectations." *McCabe*, 100 Cal. App. 4th 1111, 1124 (emphasis in original) (citing *Soule,* 8 Cal.4th at 568–569). In other words, the more appropriate question is whether an ordinary consumer can form minimum safety standards for the use of in-ear headphones—*i.e.* whether a reasonable consumer would expect that his or her AirPods Pro to be capable of playing piercing sounds, such as Amber Alerts, that lead to hearing loss, tinnitus, and other injuries B.G. experienced as a result of the Amber Alert event. *See* Ex. 3, Hahn Depo., at 119:10–25. Apple's failure to raise a summary judgment argument under the application of the consumer expectation is seemingly an admission of Plaintiff's ability to present evidence to support its defect design claim under that theory.

1

2

     **2. Plaintiff's Experts, Dr. Hahn, Dr. Tarr, and Dr. Casali, each provide testimony and evidence to overcome Apple's no-evidence challenge to the strict liability design defect claims.**

3

     Although Apple has failed to demonstrate that the consumer expectation test is inappropriate

4

in this case, this Court need not decide between the application of these tests at this time because

5

Plaintiff can also present evidence to support its claims under either the consumer expectation or

6

risk-utility test.

7

     Apple's contentions that Plaintiff "cannot prove that AirPods Pro are defective such that they

8

present a risk of acute noise-induced hearing loss caused by acoustic trauma" (Mot. Summ. J. at

9

21:11) and that "Plaintiff's primary product design expert, Dr. Casali, cannot create a triable issue

10

as to the existence of a relevant defect . . . without Dr. Hahn's unsupported causation opinion,"

11

(Mot. Summ. J. at 22:4–8) are just reiterations of the same causation argument it has raised

12

repeatedly and that Plaintiff has had to repeatedly dispel because Dr. Hahn has presented more

13

than enough evidence that acoustic shock and perilymphatic fistula can account for B.G.'s

14

symptoms of dizziness, nausea, vertigo, tinnitus, and hearing loss, while the perilymphatic fistula

15

that resulted from the Amber Alert event can, and did, cause B.G.'s hearing loss in his right ear.

16

*See supra* § I; *see also* Pl.'s Resp. to Mot. to Exclude § I;  Ex. 1, Hahn Rpt., at 5–7; Ex. 3, Hahn

17

Depo., at 19:3–6, 27:24–25, 36:14–20, 38:20–39:1, 64:4–6, 51:24–52:17, 75: 14–18, 76:17–77:10,

18

113:14–16, 120:10–17.

19

     **a. Apple Ignores the Finding of Dr. Tarr.**

20

     Additionally, Apple's Motion for Summary Judgment completely ignores the testimony of

21

Dr. Eric Tarr, whose findings prove that Apple failed to conduct the proper evaluation of its Amber

22

Alert signal before it launched the AirPods Pro (1st generation) listening device. According to Dr.

23

Tarr, Apple's design of the AirPods Pro did not test or evaluate the maximum sound pressure

24

output of the Amber Alert compared to the programme simulation noise used to certify the

25

listening device. *See* Ex. 15 Tarr Aff., ¶ 4–8. Dr. Tarr—an electrical and computer engineer with

26

a Ph.D., professor of Audio Engineering Technology, and software create for many different

27

companies (*see* Ex. 15, Tarr Aff., ¶ 1), who Apple has not sought to strike as an expert—performed

28

analysis of both signals revealed different sound pressure levels. *See id.*, ¶ 4. Comparing the two signals, the Amber Alert's peak amplitude measured 5.13 decibels greater than the programme simulation noise. *See id.*, ¶ 5. The pulses of the Amber Alert were measured to exceed the 100 dBA requirement of the certification standards by Dr. Casali and Dr. Fligor, respectively. *See id.*, ¶ 12. According to John Casali, a three-decibel increase of the sound pressure level doubles the sound power, or intensity, in Watts. *See* Ex. 11, Casali Aff., ¶ 12. Apple's retained experts failed to address this discrepancy during the discovery period of this case. Moreover, Apple's summary judgment motion *never* addresses this discrepancy in the 25-page brief it filed seeking the dismissal of Plaintiffs' claims against it.

Moreover, Dr. Tarr has provided his opinions that, upon his review of Apple's source code related to the presentation of an Amber Alert, he observed that there was no software limiter, which should have been included in the software code limit the Amber Alert's "amplitude below 100 dB SPL." Ex. 12, Tarr Rpt., at 21. While Apple's expert has made a claim that some type of output limiter was included, Dr. Tarr has pointed out that Apple's expert has contradicted himself in many ways and cannot point to that alleged code. *See* Ex. 15, Tarr Aff., ¶ 9; Ex. 13, Tarr Supp. Rpt. at 6; Ex. 14, Tarr Depo., at 132:8–21, 198:2–13. Regardless, Dr. Tarr has also demonstrated that Apple's own documents show that the limitation Apple's expert refers to would only apply in "voice processing mode," which would have no bearing on the Amber Alert event B.G. experienced. *See* Ex. 15, Tarr Aff., ¶ 9; Ex. 14, Tarr Depo., at 197:6–11. Accordingly, Dr. Tarr can testify to numerous opinions in this case, including that Apple's source code failed to include a limiter to reduce the amplitude of the Amber Alert when played through AirPods Pro, as it should have. *See See* Ex. 15, Tarr Aff., ¶ 9; Tarr Depo., at 258:18–260:17; Ex. 12, Tarr Rpt. at 23 ("Apple Inc did not have reasonably safe code in use that would have decreased the risk of excessive exposure to sound during an Amber Alert.").

**b. Apple misrepresents the opinions and testimony of Dr. Casali.**

Plaintiff's expert Dr. Casali, who Apple has also not sought to strike as an expert, provides further opinions regarding the insufficient safety testing and limitations of the AirPods Pro. Dr. Casali is the developer of the Auditory Systems Laboratory at Virginia Tech, and has 42 years of

experience as engineering professor in numerous areas, including human factors, safety, warnings, acoustics, human hearing, hearing protection design and testing, earphone and headphone design and testing, noise exposure, auditory situation awareness, product and system design, and human-equipment interface design. Ex. 11, Casali Aff., ¶ 3–4; Ex. 9, Casali Depo. – Oct. 2024, at 234:15–237:16. Specifically, Dr. Casali provides his opinion that Apple failed to perform appropriate safety testing and that "[w]ithout such testing, the earphone output at the user's tympanum (eardrum) for various input signals is simply unknown to the manufacturer, and this is an untenable position since it was well known in the hearing conservation community circa 2019 that earphone output levels have the potential to produce noise-induced hearing loss in users." Ex. 7, Casali Rpt., at 17; *see* Ex. 9, Casali Depo. – Oct. 2024, at 56:11–17, 78:1–21, 125:2–10, 139:22–140:20.

Given the expert opinions and testimony of Dr. Hahn, Dr. Tarr, and Dr. Casali, Plaintiff's strict liability design defect claim is clearly supported by the evidence.

### 3. Apple's no-evidence attack on the evidence of a feasible design is misplaced and, regardless, wrong.

Apple's only remaining no-evidence attack on Plaintiff's design defect claim is that "Plaintiff has no evidence to rebut that the proposed alternative design is feasible"—a claim that is exactly as backwards as it sounds. Mot. Summ J. at 22:16. In *Barker*, the Supreme Court of California discussed the burdens related with design defect factors and explained that this burden is placed on Apple:

> The allocation of such burden is particularly significant in this context inasmuch as this court's product liability decisions, from Greenman to Cronin, have repeatedly emphasized that one of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action. Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard—*e. g.*, ***the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective.***

*Barker*, 20 Cal. 3d at 431 (emphasis added); *see also Kim v. Toyota Motor Corp.*, 6 Cal. 5th 21,

37 (2018) ("To ease the burden on plaintiffs in a strict liability action, in *Barker* we assigned to the defendant the burden of demonstrating that the benefits of the challenged design outweigh its risks."). Thus, at best, Apple has confirmed that there is a material fact question on this topic.

Nonetheless, to be clear, Plaintiff's experts have provided opinions regarding the existence and feasibility of and alternative design, by simply employing an output limiter to reduce the amplitude of the Amber Alert played through the AirPods. *See* Ex. 11, Casali Aff., ¶ 13–14 ("Therefore, it is my opinion that a digital output limiter constitutes an effective and low-cost, if not no-cost, safety countermeasure that was available prior to introduction of the AirPods Pro in October, 2019."); Ex. 10, Casali Depo. – Dec. 2024, at 442:21–443:25; Ex. 7, Casali Rpt., at 18; Ex. 8, Casali Supp. Rpt., § V; Ex. 9, Casali Depo. – Oct. 2024, at 213:11–13; Ex. 12, Tarr Rpt., at 21 ("Apple Inc should have included software code to process the Amber Alert signal to limit its amplitude below 100 dB SPL. In particular, an audio effect called a dynamic range processor could have been used. This effect has the purpose of compressing or limiting the amplitude of a signal.").

### B. Plaintiff has Evidence to Support her Negligence Claims.

Apple's Motion for Summary Judgment further regurgitates the exact same argument—that "Plaintiff's negligence-based product liability claims foreclosed because of a Plaintiff's inability to prove the existence of a relevant defect" (Mot. Summ J. at 23:4–6)—as it did when it alleged that Plaintiff's strict liability claim of design defect because she had no evidence of a "relevant defect . . . without Dr. Hahn's unsupported causation opinion," (Mot. Summ. J. at 22:4–8).

The negligence inquiry with regard to design defect claims requires manufacturers to use "reasonable care" to so design products that are safe for the use for which they are intended. *Pike v. Frank G. Hough Co.*, 2 Cal. 3d 465, 470 (1970) (citing *Varas v. Barco Mfg. Co.*, 205 Cal.App.2d 246, 258 (1962)). "What is 'reasonable care,' of course, varies with the facts of each case, but it involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." *Dominguez v. Excel Mfg. Co. Inc.*, No. C-09-03611 EDL, 2010 WL 4698739, at *15 (N.D. Cal. Nov. 8, 2010) (quoting *Pike*, 2 Cal. 3d at 470)

While Apple avoids a discussion of "reasonable care," makes no specific claim of lacking

duty, and cites no law to support its contention that a negligence claim is subject to summary judgment for lacking evidence of a "relevant defect," as it uses that phrase, Apple does make clear that it believes it is "entitled to summary judgment for the same reasons as it is entitled to summary judgment on Plaintiff's strict liability design defect claims." Mot. Summ. J. at 23:4–15. Thus, regardless of whether Apple has even met its bare minimum summary judgment burden to identify where Plaintiff allegedly lacks evidence, Apple's argument fails based on the same reasoning and evidence that Plaintiff has addressed with regard to its strict liability design defect claims. *See supra* § II. A; *see also* Ex. 15, Tarr Aff., ¶ 4–8; Ex. 11, Casali Aff., ¶ 12–14.

### C. Plaintiff has Evidence to Support her Strict Liability Claims for Failure to Warn Claims.

Again, this time with regard to Plaintiff's failure to warn claims, Apple repeats its same argument that there is "no risk of acute noise hearing loss," citing directly to the section of its motion regarding Dr. Hahn's differential diagnosis. Mot. Summ. J. at 24:1–8. However, "[a] product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." *Saller*, 187 Cal. App. 4th at 1238 (quoting *Canifax v. Hercules Powder Co.* 237 Cal. App. 2d 44, 52–53 (1965)).

A defective warning claim "'requires that the manufacturer knows, or should have known, of the danger of the product at the time it is sold or distributed,' and that 'the plaintiff prove that defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution.'" *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Products Liab. Litig.*, 754 F. Supp. 2d 1208, 1221–22 (C.D. Cal. 2010) (quoting *Saller*, 187 Cal. App. 4th at 1238)).

Plaintiff has presented more than enough evidence to support such claims. To re-iterate, Plaintiff has presented expert testimony that acoustic shock and perilymphatic fistula can account for B.G.'s symptoms of dizziness, nausea, vertigo, tinnitus, and hearing loss, while the

perilymphatic fistula that resulted from the Amber Alert event can, and did, cause B.G.'s hearing loss in his right ear. *See supra* § I; *see also* Pl.'s Resp. to Mot. to Exclude § I;  Ex. 1, Hahn Rpt., at 5–7; Ex. 3, Hahn Depo., at 19:3–6, 27:24–25, 36:14–20, 38:20–39:1, 64:4–6, 51:24–52:17, 75: 14–18, 76:17–77:10, 113:14–16, 120:10–17.

Moreover, Plaintiff has presented evidence that Apple's AirPods Pro needed to have a limiter to be safe, and that Apple, minimally should have known. *See* Ex. 15, Tarr Aff., ¶ 9 ("the presence of a limiter within the AirPod Pro® headphones (15Generation) indicates that Apple Inc knew or should have known that exposure to potentially dangerous loud sound was possible with their device."); Ex. 12, Tarr Rpt., at 21; Ex. 13, Tarr Supp. Rpt. at 6; Ex. 14, Tarr Depo., at 132:8–21, 197:6–11, 198:2–13.

Plaintiff's expert Dr. Anthony Andre—a board certified ergonomist, who holds a Ph.D. in human factors and ergonomics profession, with more than 30 years of consulting experience in his field (*see* Ex. 16, Andre Rpt., at 2), and who Apple has not sought to strike as an expert—provides his testimony and opinion that the iPhone "user interfaces mislead users into thinking they can a) set the volume level of all alerts, to include Amber alerts, and b) reduce loud sounds heard through their headphones, such as AirPods, to include Amber alerts" but "never states that Amber alerts are not covered by these and other settings designed to give user control over their sound volume and to protect them from excessively loud sounds." Ex. Ex. 16, Andre Rpt., at 26; *see also* Ex. 17, Andre Supp. Rpt., at 5 ("[T]he issue here is not just the sound pressure level of the Amber Alert presented through the AirPods Pro, which are worn in the ear, but also because Apple fails to inform, instruct or warn users that their sound level settings, even those that apply to 'alerts' will be ignored and exceeded when an Amber Alert is presented."); Ex. 18, Andre Depo., at 119:4–11; 189:2–24.

Apple's second, and last, argument regarding the warning claims is that "B.G. testified he never read the product warnings such that any warning would have made a difference." Mot. Summ. J. at 30:12–13. However, B.G.'s mother did read the warnings and written material that came with the AirPods and, after reading about the warning against use of high volume that did appear, advised her son not to use the AirPods with a high volume. *See* Ex. 19, Reyes Depo., at

67:15–71:16. Apple again construes the strict liability law, which has been "shaped judicially" in order "to improve the safety features of a product." *Camacho v. JLG Indus. Inc.*, 93 Cal. App. 5th 809, 825 (2023), reh'g denied (Aug. 16, 2023) (quoting *Campbell v. Gen. Motors Corp.*, 32 Cal. 3d 112, 121 (1982)). Where a plaintiff can demonstrate through circumstantial evidence that the warnings would have been conveyed to the plaintiff, as here would have been done by B.G.'s mother, there is sufficient evidence for the jury to decide the claim. *See id.* (reversing the trial court's grant of a direct verdict and rejecting defendant's argument that plaintiff has no evidence that he "read or relied on the placard or any of the other safety information provided by JLG" because there was circumstantial evidence that "Camacho was in close proximity to the warning label for some meaningful period of time.")

**D. Plaintiff has Evidence to Support her Warranty Claims.**

Apple's only assertion to defeat Plaintiff's warranty claims is that "Apple is entitled to summary judgment on Plaintiff's defect claims," the claims are virtually the same, and "Plaintiff's breach of implied warranty claims fail for the same reasons as her strict liability defect claims." Mot. Summ. J. at 24:18–23. However, as established above, Plaintiff has presented evidence to overcome all of Apple's no-evidence challenges to her strict liability claims for design defect and warning defect. *See supra* §§ II. A, C. Accordingly, by Apple's own logic, Plaintiff has evidence to support its breach of implied warranty claim.

<b>CONCLUSION</b>

For these reasons, Plaintiffs respectfully request that this Court: deny Defendant Apple Inc.'s Motion for Summary Judgment.

Respectfully submitted,

Dated: February 21, 2025          **PARANJPE MAHADASS RUEMKE LLP**

By: *_/s/ Tej R. Paranjpe_____*
Tej R. Paranjpe

*Attorney for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**<u>CERTIFICATE OF SERVICE</u>**

15
16
17

     I hereby certify that on February 21, 2025, a true and correct copy of the foregoing instrument was forwarded to all interested counsel in accordance with the Federal Rules and LR 5-5 the Court's ECF System.

                               By: */s/ Tej R. Paranjpe*
18
                                    Tej R. Paranjpe
19
20
21
22
23
24
25
26
27
28